[Crim. No. 4271. In Bank.—July 17, 1940.]

THE PEOPLE, Respondent, v. EMORY BUZZELL, Appellant.

Martin & Harrah for Appellant.

Earl Warren, Attorney-General, and Paul D. McCormick, Deputy Attorney-General, for Respondent.

CARTER, J.—In an information filed by the district attorney of Los Angeles County defendant was charged, in

separate counts, with murder and attempted robbery. A prior conviction of robbery was also alleged. Defendant entered pleas of not guilty to each count but admitted the prior conviction. At the conclusion of the trial the jury found defendant guilty as charged, and inasmuch as the verdict finding him guilty of murder in the first degree was without recommendation the death penalty has been imposed. Defendant appeals from the judgment and order denying his motion for a new trial.

Upon such appeal defendant does not challenge the sufficiency of the evidence to support the verdicts. He concedes, and the evidence virtually dictates such concession, that one Victor Stilgenbauer, a druggist operating a drug-store at the corner of Eleventh and Valencia Streets in the city of Los Angeles was shot in the head and fatally wounded at approximately 5:30 o'clock on the evening of March 23, 1939, as he pursued one of two men who had attempted to rob his store. The evidence establishing the foregoing briefly narrated facts is uncontradicted and defendant obviously makes no assault thereon. Neither does he challenge the sufficiency of the evidence identifying him as the perpetrator of the attempted robbery and the resulting homicide. However, he does contend that the identification evidence is not as positive or as definite as might be desired and that, therefore, certain errors allegedly committed by the trial court and urged by him upon this appeal assertedly assume magnitude and require a reversal. Prefatory to a consideration of the five assignments of error advanced by defendant, we shall briefly narrate the evidence tending to connect him with and to establish him as the perpetrator of the homicide.

A female employee of the drug-store positively identified defendant as the man who had entered the store between the hours of 10 and 12 o'clock on the day preceding the homicide and had asked permission to use the telephone. After asking for change for the telephone defendant walked in the direction thereof but did not enter the booth provided therefore. While in the store defendant looked from one side to the other and appeared to examine the side door. His actions apparently aroused the employee's suspicions for she requested the now deceased owner to come from his living quarters in the rear into the store, which he did. In due time defendant left the store without any untoward happening.

An employee of a nearby market testified that he had seen defendant on the day prior to the homicide walking back and forth in front of and looking into said market "like a man who was sizing up the store". This witness also testified that shortly after 5:00 P. M. on the day of the homicide defendant came into the market where he worked and purchased cigarettes, whereupon defendant left and walked in the direction of the deceased's drug-store which was two doors removed. Shortly thereafter, as the witness left the market to go to the warehouse he noticed defendant and an unidentified man in front of and peering into the deceased's drug-store. This was shortly prior to the attempted robbery and homicide. One week following the homicide, the witness positively identified defendant in a police "show-up" as the man he had seen on the two days mentioned.

Because of his absence from the jurisdiction and pursuant to stipulation, the testimony of a magazine salesman given at defendant's preliminary hearing was read into the record. This witness had testified that he was in the drug-store at approximately 5:30 P. M. on the day of the homicide and that he was told by a man carrying a gun to get on the floor. The person so commanding was observed at the cash register by the witness. At that moment the offender fired a shot in the direction of the rear of the store. The witness heard a second shot fired outside the store, undoubtedly the fatal shot for it is uncontradicted that the deceased was mortally wounded as he pursued a man down the street. As to the identity of the person he had observed rifling the cash register and who had fired the shot, the witness testified, "I could not say that I can positively identify, but he [the defendant] is the man whose picture I had in the back of my mind . . . it must have been the same man . . . the man that I had a picture of in my mind came to me when I went to the lineup and saw Mr. Buzzell [the defendant] . . . it didn't take me long to pick him out . . . I immediately recognized him . . . "

The testimony of a second witness at the preliminary hearing was read into the record because of his absence from the jurisdiction and his presence in Alaska. The witness had testified that as he passed along the sidewalk in the company of a lady at approximately 5:20 P. M. on the day of the homicide he heard a shot in the deceased's drug-store; that the

defendant, an unidentified man and the deceased ran out of the drug-store; that he (the witness) "took out after" them; that the deceased had a bottle in his hand and "this here bandit took and shot him in the right temple"; that in the police show-up he recognized defendant "as soon as I first saw him". This witness also testified that defendant was wearing tennis shoes at the time, and a police officer later testified that at the time of his arrest one week after the homicide defendant had a pair of tennis shoes in his possession.

Two other witnesses called by the prosecution, a newsboy on the street corner and a man who had been sitting in the window of his home at the time, were unable to say whether or not defendant was the person they had seen in or about the deceased's drug-store at the time of the shooting.

A customer in the store at the time testified that while he was "not positive" that defendant was the man who appeared in the drug-store and announced a "stick-up," he "looks similar to the man I saw".

We need not further detail the evidence pointing to and identifying defendant as the perpetrator of a cold-blooded murder committed in the course of or while fleeing from the scene of an attempted robbery. The evidence in this and other particulars was ample. The defense was that of alibi. Defendant's principal witnesses in his attempt to establish his presence elsewhere on the day prior to and on the day of the homicide, when the prosecution witnesses had placed him in or near the deceased's drug-store, were two half-brothers with whom defendant lived and each of whom, like defendant himself, had suffered a prior felony conviction which, under section 2051 of the Code of Civil Procedure, served to impeach him as a witness. The testimony of other defense witnesses tending to place defendant and his room-mates in an automobile some forty miles distant from the scene of the homicide is not wholly irreconcilable with the testimony of prosecution witnesses in view of the rapidity with which the modern automobile travels. Evidence of the prosecution tended to establish that the forty-mile gap could comfortably be traversed in an hour, and some of the defense testimony placed defendant and his companions at said removed place an hour or more prior to the commission of the homicide. These and other matters were for the jury to weigh and determine in its consideration of the cause. We

cannot say that the conclusion reflected in its verdicts is without support in the evidence. Therefore, we pass to a consideration of defendant's five assignments of error.

Defendant took the witness stand in his own defense in an effort to establish his alibi. During his direct examination he testified at some length as to his movements on the day of the homicide. At no time were any questions asked or statements made relative to the possession by him and his companions on that day of certain sawed-off shotguns. However, on cross-examination he was questioned, over objection, as to the possession of and asserted practice shooting with said sawed-off shotguns during the day of the homicide. Defendant and his companions admittedly had the guns in their automobile on that day and had fired them in target practice. But defendant urges that the trial court committed prejudicial error in permitting the cross-examination in this respect to go beyond the scope of the direct examination. The rule on this subject is so well settled that we need not here restate it or cite authorities in support thereof. In opposition to this contention the People urge that the cross-examination complained of and the evidence adduced thereby were material and pertinent to the activities and movements of defendant on the day of the homicide, a subject upon which he had testified in full on his direct examination. A liberal application of the rules of evidence tends to justify the challenged cross-examination on the theory advanced by the People. In *People* v. *Rosenthal,* 139 Cal. App. 42, 46 [33 Pac. (2d) 864], it is stated that "Defendant having taken the stand and having testified concerning his movements on the day in question, was clearly subject to cross-examination as to such movements and as to his companions at a time just prior to the commission of the offense." However, whether or not this be so we fail to perceive wherein any prejudice could have resulted to defendant in view of the prosecution evidence pointing to him as the murderer and in view of the fact that the possession and use of the sawed-off shotguns had been brought out earlier in the trial during the *direct* examination of one of *defense* witnesses. Under all of the circumstances, the mere repetition of the matter, whether appropriate or not, could not have resulted in a miscarriage of justice within the meaning of section 4½ of article VI of the

Constitution. (*People* v. *Hoffman*, 199 Cal. 155, 162 [248 Pac. 504].)

 Nor do we find any error in the rulings of the trial court with respect to the cross-examination of the defense witness Sang relative to the possession and use of said sawed-off shotguns by the trio on the day of the homicide. It was Sang, defendant's roommate and one of his principal alibi witnesses, who on direct examination, as just above intimated, had earlier brought out in response to interrogatories by defense counsel that they had so possessed and used the sawed-off shotguns. The subject concededly having been so opened on direct examination of the witness could be fully explored on his cross-examination. We find no improprieties in such cross-examination nor in the rulings thereon. Nor do we find any error in the rulings on that phase of the cross-examination of said witness having to do with the length of time he had known defendant and the places where he had associated with him. Such cross-examination was relevant to the interest and credibility of the witness and was not rendered improper merely because an answer required disclosure of their prior association in prison. What has been said above with respect to the cross-examination of defendant relative to the possession of sawed-off shotguns is equally applicable to the somewhat similar cross-examination of the defense witness Revalle, a sixteen-year-old high school boy and half-brother of defendant's roommates and principal alibi witnesses. In other words, the error, if any, in the rulings on the cross-examination of this witness could not have been prejudicial. However, we cannot say that error there occurred. The boy had been called by the defense in furtherance of the alibi theory and on direct examination had testified generally as to his activities on the day of the homicide and as to having seen and *talked* with his half-brothers and defendant. It was therefore proper on cross-examination to inquire as to the nature of their talk or conversation. When it appeared on such cross-examination from the voluntary statement of the witness that the trio had asked him "if we had any old guns around", it was not improper for the prosecution to pursue the subject further in an endeavor to fully develop what there occurred.

 In his next two assignments defendant contends that the court below erred in assertedly permitting the prosecu-

tion, over objection, to go into the details of prior crimes committed by defendant and his two principal alibi witnesses. In short, it is urged that the prosecution was permitted to go beyond the point of showing prior conviction of a felony for impeachment purposes. As indicated earlier in this opinion, defendant and his two principal alibi witnesses were susceptible to impeachment by reason of the showing that they had suffered prior felony convictions. The occasional recurrence to the subject during their cross-examination, while perhaps repetitious and unnecessary, could not have caused any prejudice. Much of such cross-examination was intended to show the interest or bias of the witnesses, and the fact that it tended to disclose their association in prison as well as elsewhere did not, as stated under a prior assignment, render the same improper. We cannot say that the cross-examination, the rulings in connection therewith or the argument of the district attorney on the subject exceeded the bounds of propriety or resulted in a miscarriage of justice.

█ In his final contention defendant urges that the court below erred in refusing to give a requested instruction to the effect that evidence of defendant's prior conviction of a felony went only to his credibility as a witness and was not proof of his guilt of the offenses on which he was standing trial. The trial court refused said instruction on the ground that the subject thereof was "covered by other instructions". A reading of the entire charge to the jury satisfies us that it was full and fair. In addition to the usual stock instructions covering the presumption of innocence, the degree of proof, the definition of reasonable doubt and the jury's duty to resolve dual interpretations of the evidence in favor of defendant's innocence, the court further charged the jury that "a witness may also be impeached by proof that he has been convicted of a felony" and, at defendant's request, that "A previous conviction of a felony does not necessarily destroy the credibility of any witness . . . It is simply a circumstance of more or less weight which you are authorized to take into consideration in determining what credit shall be given to him with respect to his testimony". It is obvious that the court below thereby clearly informed the jury that evidence of a prior conviction suffered by any witness, whether he be the defendant or another, was a factor to be considered only in connection with the weight to be accorded to the testimony of

said witness. In our opinion, the instruction properly confined the evidence of a prior felony conviction to the credibility of the witness.

The judgment and order appealed from are, and each is, affirmed.

Curtis, J., Shenk, J., Edmonds, J., and Gibson, C. J., concurred.

Rehearing denied. Houser, J., voted for a rehearing.