[Crim. No. 4685. In Bank. May 17, 1946.]

THE PEOPLE, Respondent, v. CHARLIE BERNARD, Appellant.

Frederic H. Vercoe, Public Defender, and William B. Neeley and E. E. Cuff, Deputies Public Defender, for Appellant.

Robert W. Kenny, Attorney General, and Frank Richards, Deputy Attorney General, for Respondent.

SCHAUER, J.—A jury found defendant Charlie Bernard guilty of the first degree murder of John D. Abbott, without recommendation as to penalty (which verdict resulted in imposition of the death sentence), and of assault upon Grace Abbott with a deadly weapon with intent to commit murder. Defendant Bernard appeals from the judgments entered upon the jury verdicts and from an order denying his motion for new trial. At the trial no evidence was offered on behalf of Bernard or his codefendant, Moses Hawthorne. Hawthorne, who has not appealed, was found guilty of first degree murder with recommendation of life imprisonment and of assault with a deadly weapon with intent to commit murder. His sentence

on the murder conviction recommends imprisonment for the remainder of his natural life without benefit of parole. The evidence, which without substantial conflict establishes the commission by defendants of the offenses of which they were convicted, is hereinafter summarized. We have concluded, as to the murder charge, that any verdict other than of murder in the first degree, in the light of the overwhelming evidence, would have been rationally impossible and that, therefore, certain errors in instructions hereinafter noted could not have prejudiced defendant Bernard. (The errors do not affect the choice of penalty and that choice rested wholly in the discretion of the jury (Pen. Code, § 190).)

John D. Abbott and his wife, Grace, resided near Chatsworth in the county of Los Angeles. Defendant Bernard had lived near Chatsworth from 1933 until 1937 or 1938 and during this period he worked for the Abbotts from time to time on various "odd jobs." On May 19, 1945, when the crimes charged were committed, Mr. Abbott was 76 years old and nearly blind; Mrs. Abbott was 70 years old.

On Friday, May 18, 1945, in Los Angeles, Bernard for the first time met defendant Hawthorne. Bernard told Hawthorne that he planned to go to Chatsworth, rob the Abbotts, "and leave them locked up so the police could find them." Hawthorne and Bernard went from Los Angeles to Chatsworth. On Friday night they hid near the Abbott residence. Hawthorne was armed with a club cut from a tree; Bernard was armed only with a pocket knife. Defendant saw Mr. Abbott come out of his house and stand for a few minutes on a small porch which adjoined his bedroom. They did nothing, Bernard said, because they were too far from the house to approach without attracting Mr. Abbott's attention. On Saturday night, May 19, defendants again hid near the Abbott residence. Each was armed with a club. Again they saw Abbott come out of the house and stand on the porch for a few minutes but they did nothing. When Abbott went into the house they stationed themselves on either side of the porch door and remained hidden by shrubbery until, about an hour later, Abbott once more came onto the porch. As Abbott turned to go into the house, Bernard stepped behind him and struck him on the head with the club. Abbott tried to cross his room, apparently to reach a gun which hung in a holster at the head of his bed. Bernard struck him repeatedly over the head with the club, shattering his skull. Mrs. Abbott was in

her bedroom at the other end of a hall which led from Abbott's room. The lights in her room were out but she was awake and heard a sound which she believed was Mr. Abbott falling. She called, heard no answer, started to get out of her bed, and the defendants came into her room. Bernard, whom she recognized, stood in the doorway while Hawthorne struck her four times over the head with his club, inflicting severe wounds, then pulled a pillow case over her head. The defendants went back and forth between Mr. and Mrs. Abbott's rooms several times. Bernard ransacked the rooms while Hawthorne tied a towel about Abbott's mouth, bound his hands and feet, placed him in the closet of his room, and locked the closet door. Hawthorne then tied Mrs. Abbott's hands and feet and locked her in the closet of her room. Mrs. Abbott, who did not lose consciousness, waited quietly in the closet until she believed the defendants had gone, then slipped out of her bonds, climbed out the closet window, and went around the house and into her husband's room. She called her husband, heard no answer, found his closet door locked, and went to a neighbor's house for aid. Neighbors who went to the Abbott house found no key to Mr. Abbott's closet, pried open the closet door, and found his body. (One of the neighbors, a doctor, testified that, although he did not touch Mr. Abbott, in his opinion Abbott was dead when they found him.) The police arrived soon after the body was found

Defendants were arrested in Los Angeles on Sunday morning, May 20, 1945. In Bernard's possession were many articles of personal property, including jewelry, purses containing money, and a gun, which Mrs. Abbott identified as having belonged to her and Abbott. Defendants returned to Chatsworth with the police, pointed out the locations where they had hidden keys which they took from the Abbott house and the clubs which they had used, and reenacted their entrance into the Abbott house. Other evidence, including testimony showing many admissions of Bernard, and real evidence linking defendants with the crimes, needs no further specification.

■ A confusing and erroneous stock instruction concerning the degrees of murder was given. It contained, among others, the following (italicized) erroneous statements of law: "There are *certain kinds of murder* which *carry with them conclusive evidence of premeditation.* . . . These cases are of two classes: First: *Where the killing is perpetrated by means of poison, etc. Here the means used is held to be con-*

*clusive evidence of premeditation.* Second: *Where the killing is done in the perpetration or attempt to perpetrate, some one of the felonies enumerated in the statute* [Pen. Code, § 189], *here the occasion is made conclusive evidence of premeditation. Where the case comes within either of these classes the test question: Is the killing willful, deliberate and premeditated? is answered by the statute itself.* . . . But there is another and much larger class of cases included in the definition of murder in the first degree, which are of equal cruelty [etc.]. . . . In this last class of cases the legislature leaves the jury to determine, from all the evidence before them, the degree of the crime, but prescribes for the government of their deliberations *the same test* which has been *used* by itself *in determining the degree of the other two classes, to wit: Is the killing willful, deliberate, and premeditated?* . . .'' (Italics added.) Of course the fact that a killing is committed in the perpetration of, or attempt to perpetrate, one of the five felonies enumerated in section 189 of the Penal Code is not conclusive, or necessarily any, evidence that such killing was willful, deliberate, and premeditated. Even where the killing in perpetration or attempted perpetration of one of the named felonies is unintended and accidental, nevertheless, as held in *People* v. *Lindley* (1945), 26 Cal.2d 780, 791 [161 P.2d 227], ''the offender 'is guilty of murder of the first degree by the force of the statute.' [Citations.] If the evidence establishes conclusively that the murder was so committed, then only a verdict of murder of the first degree may properly be rendered. And even where the showing is not conclusive, if the record affords substantial support for the conclusion that one of the enumerated felonies was perpetrated or attempted, and the killing was committed in such perpetration or attempt, the judgment must be affirmed. [Citations.]'' Similarly the murderer who kills by torture or poison may intend only to inflict suffering, not death. Evidence of the means used might support an inference that the killing was willful, deliberate, and premeditated, but where the jury has found that the killing was by poison, lying in wait, or torture it is not their function to go farther and draw inferences as to the manner of the formation and carrying out of an intention to kill. In such a case the question which the statute (Pen. Code, § 189) answers affirmatively is not, ''Is the killing willful, deliberate and premeditated?''; it is, ''Is the killing murder of the first degree?'' Killings by the means or on the occasions under dis-

cussion are murders of the first degree because of the substantive statutory definition of the crime. Attempts to explain the statute to the jury in terms of nonexistent "conclusive presumptions" tend more to confuse than to enlighten a jury unfamiliar with the inaccurate practice of stating rules of substantive law in terms of rules of evidence.

■ The jury were instructed that there need be "no appreciable space of time between the intention to kill and the act of killing—they may be as instantaneous as successive thoughts of the mind"; that "A man may do a thing willfully, deliberately and intentionally from a moment's reflection as well as after pondering over the subject for a month or year"; and that a man "can premeditate, that is, think before doing the act, the moment he conceives the purpose, as well as if the act were the result of long preconcert or preparation." The first of the three statements (that there need be "no appreciable space of time between the intention to kill and the act of killing . . .") is abstractly a correct enunciation of the law. As has been said before "It will be properly understood (at least upon *deliberation*) by those learned in the law as referring only to the interval between the fully formulated intent and its execution, *and as necessarily presupposing that true deliberation and premeditation characterized the process of, and preceded ultimate, formulation* of such intent." (*People* v. *Bender* (1945), 27 Cal.2d 164, 182 [163 P.2d 8]; *People* v. *Thomas* (1945), 25 Cal.2d 880, 900 [156 P.2d 7].) But, as was also pointed out in the Bender case, holding that such declaration is a correct statement of an abstract principle is not a holding that the same declaration made to a jury without explanation is not error. When it is coupled with the two other statements above quoted it becomes clearly misleading and erroneous. It excludes from the required showing any deliberation and premeditation between the intent and the act of killing and since the other statements eliminate any necessity for deliberation or premeditation in forming the intent ("He can premeditate . . . the moment he conceives the purpose," etc.), the effect of the whole instruction is to completely delete the only difference, in the type of murder to which the instruction is applicable, between first and second degree murder. Instructions on this subject must not emphasize the element of haste to the exclusion of the element of preconceived design. As held in the Bender case (at p. 185) "while the jury may be told that the brain can function rapidly they

must not be misled into thinking that an act can at the same time be hasty, hurried, and deliberate, or impulsive, unstudied, and premeditated." For reasons hereinafter stated, however, the error in giving the above quoted instructions is not, under the facts of this case, prejudicial.

 The jury were told, by a stock instruction, that "If the accused was engaged in the performance of an unlawful act, and if the deceased attempted in a lawful manner to prevent the performance of such unlawful act, and if, while so endeavoring to prevent the same, the defendant in anger and solely for the purpose of revenge, or to enable him to carry out his unlawful design, so interfered with by said deceased, attacked the latter with a deadly weapon, intending to kill said deceased, and did, under such circumstances, carry such intention into execution, the fact that defendant was in a passion would not mitigate or excuse such homicide, but the crime committed would in such case be murder in the first degree. It is not less murder because the act is done suddenly after the intent to commit the homicide is formed. It is sufficient that the *malicious intention* precedes and accompanies the act of homicide." (Italics added.) Under the first sentence of this instruction, if the accused was engaged in the performance of any unlawful act, whether battery or a traffic violation, and in an ensuing, sudden, violent quarrel growing out of the remonstrance of deceased against the commission of such unlawful act, killed deceased with a deadly weapon, the accused would be guilty of murder of the first degree. Such, of course, is not the law. The statement as made transgresses the rules both as they appertain to voluntary manslaughter and as they relate to differentiation between first and second degree murder. The second and third sentences of this instruction are manifestly erroneous if, as they apparently do, they refer to first degree murder. (*People* v. *Thomas* (1945), *supra,* 25 Cal.2d 880, 898; *People* v. *Bender* (1945), *supra,* 27 Cal.2d 164, 182.) They destroy the statutory difference in the degrees of murder and would authorize conviction of first degree murder upon proof of facts amounting to only second degree murder. The instruction, however, could not have prejudiced defendant Bernard, who was admittedly engaged in the perpetration of the unlawful act of robbery at the time of the killing. But the instruction is erroneous, confusing, and in its literal application to possible factual situations absurd, and the practice of giving it should be wholly discontinued.

■ Errors in the instructions relating to the differences between the degrees of murder were not, of course, prejudicial so far as the charge of assault with a deadly weapon with intent to commit murder is concerned, for the law (Pen. Code, § 217) recognizes no such offense as assault with intent to commit murder of the second, as opposed to the first, degree.

■ So far as the murder charge is concerned, in a case such as this, where the facts impel a conviction of murder of the first degree both because the murder was committed in the perpetration of robbery and because it was committed by means of lying in wait, and do not admit upon any view of the evidence of a finding other than of murder of the first degree, there is no occasion whatsoever to give instructions as to the differences between the degrees of murder. Hence, although the instructions as to such differences were manifestly erroneous, the errors cannot have prejudiced the appealing defendant.

The judgment and order appealed from are affirmed.

Gibson, C. J., Shenk, J., Carter, J., Traynor, J., and Spence, J., concurred. Edmonds, J., concurred in the judgment.