[Crim. No. 4724. In Bank. Sept. 24, 1946.]

THE PEOPLE, Respondent, v. JOHN J. PETERSON, Appellant.

No appearance for Appellant.

Al Matthews as Amicus Curiae on behalf of Appellant.

Robert W. Kenny, Attorney General, Walter L. Bowers and Frank Richards, Deputies Attorney General, for Respondent.

SCHAUER, J.—Defendant* was charged with the murder of Marion Berger and with three prior convictions of felony.

---

*This defendant was before us on a former appeal after conviction on the same charge. The case was then entitled *People* v. *Sarazzawski* and is reported in 27 Cal.2d 7 [161 P.2d 934]. The present appeal follows conviction on the new trial.

He pleaded not guilty and admitted the prior convictions. A jury found him guilty of murder of the first degree and made no recommendation as to penalty. This is an automatic appeal from the judgment imposing the death sentence and from an order denying defendant's motion for a new trial. Defendant offered no evidence. The strong circumstantial case presented by the People shows that defendant murdered Mrs. Berger in the perpetration of a robbery. The murder, therefore, is by force of statute (Pen. Code, § 189) of the first degree. (*People* v. *Valentine* (1946), 28 Cal.2d 121, 136 [169 P.2d 1] ; *People* v. *Bernard* (1946), 28 Cal.2d 207, 211 [169 P.2d 636].) The record discloses certain erroneous and conflicting instructions but after a review of the entire case we are satisfied, for the reasons hereinafter appearing, that the erroneous instructions did not contribute to the verdict and that the judgment and order must be affirmed.

The deceased was the wife of David Berger. In April, 1943, Mr. Berger commenced work as personnel director and head of the welfare department of the manufacturing plant where defendant was employed. He became acquainted with defendant and in his official capacity on various occasions gave defendant advice and assistance concerning defendant's personal problems. Defendant was an alien and was on parole; among Berger's duties as head of the welfare department was the preparation of monthly reports concerning defendant required by federal and state authorities. Twice defendant called on Mr. Berger at the Berger home in Los Angeles to seek advice as to difficulties in which he found himself. Mrs. Berger was present on these two occasions. Mr. and Mrs. Berger, defendant, and Mrs. Ann Straw, a friend of defendant, once went to dinner together at defendant's suggestion. This was the extent of defendant's acquaintance with deceased prior to the night of May 10, 1944, when she was killed.

On May 7, 1944, Mr. Berger left Los Angeles for Chicago on a business trip. He planned to be away from Los Angeles for two weeks. His proposed trip had been known to and generally discussed among the employes of the plant. He had arranged for Mrs. Berger to go to San Francisco on the morning of May 11. About 7 p. m. on May 10, 1944, Mrs. Berger was in the yard of her home. She there told the boy of a neighbor that she was going to San Francisco. The boy observed

nothing unusual in her manner. No witness thereafter saw Mrs. Berger alive. Later in the evening she, accompanied by defendant, left her home. A week later her body was recovered from the Pacific Ocean.

About 7 p. m. on May 10 defendant went to the rooming house where he lived. According to his landlady ''he changed his clothes, I guess, and he went out to get some gas and then he came out and said, 'You might not see me any more.' '' Defendant then called on his friend Mrs. Straw and her grandmother. He stayed only about 15 minutes and, according to Mrs. Straw, they spoke of ''common-place'' things. Defendant was next seen by a witness about 11 p. m. on May 10, when he entered a cafe located in Ventura County, on the Coast Highway near the boundary between the counties of Los Angeles and Ventura. According to the woman who operated the cafe defendant purchased a bottle of beer which he drank ''hurriedly and nervously.'' Defendant did not appear to be under the influence of liquor.

On the night of May 10 one Sneathen, a Coast Guardsman, was on patrol with his dog in the vicinity of Point Mugu, a promontory in Ventura County, about 10 miles northwest of the Los Angeles County line. The Coast Highway runs near the ocean at this point and there is a rather sharp drop of about 20 feet from the highway to a sea wall. About 11:20 p. m. Sneathen saw defendant's car parked off the highway near the bank. Sneathen looked in the car, saw no one, then went to the bank and saw defendant coming up from the ocean. He questioned defendant, who at first did not reply, then ''said he was looking for another man and woman there, supposed to be fishing down in there. . . . He said in a nervous way . . . that this man was out with . . . [a]nother man's wife, and he told me he shouldn't be. . . . Then after a short spell he wasn't near as nervous, so I . . . decided to continue on my patrol, and as I turned to go he struck me on the head'' with a tire iron (a narrow iron bar), knocked Sneathen down, and continued to beat him. The dog attacked defendant, giving Sneathen an opportunity to get to his feet. Sneathen ran to a nearby telephone and called his camp. Defendant pursued him but halted when Sneathen, who was armed with a pistol, threatened to shoot. Defendant then ran to his car, got in it and drove a short distance in the direction of Santa Monica, turned around and drove a short distance

past Sneathen and away from Santa Monica, turned around again, and stopped about 100 yards from Sneathen. He got out of his car and again advanced toward Sneathen, not stopping although Sneathen told him to halt. Other Coast Guardsmen arrived and took defendant to their camp. Deputy sheriffs of Ventura County came to the camp and took defendant into custody. To questions as to "what he did with the woman that he had in the car," defendant "wouldn't say anything . . . , he just stood mute." Defendant did not appear to be intoxicated when he was apprehended.

In the back of defendant's automobile were Mrs. Berger's open purse (which contained, among other things, papers bearing her name and address and ration tokens), her suit case, packed, and her hat. On the floor in the front of the car were red and blue ration tokens. There were blood and "reddish" human hair on the back of the right front seat (Mrs. Berger's hair was "auburn"), blood on the inside panel of the right door, and a pool of blood on the floor, flowing out onto the running board. Also found in the car were a pigskin glove of defendant and the tire iron; on both were stains of blood. Defendant's shirt and trousers were spotted with blood and his trousers were badly torn. Defendant was questioned by the Coast Guardsmen and the deputy sheriffs. He first refused to talk, then stated that "he had had a fight with a man by the name of Harry, and that is how the blood got in the car, and the fight had been over some woman down in Venice, and this Harry had taken the woman away from him."

Mrs. Berger's wedding ring was found in the toilet bowl in a cell of the Ventura jail where defendant was held for a time. Further examination of the ground in the vicinity of Point Mugu disclosed spots of blood along the bank leading down to the sea and "a slight ditch or trench [in the loose shale of the bank], as though something might have been drug or thrown through there." A piece of rayon fibre of the sort used in women's undergarments was caught on the rock embankment. Mrs. Berger's brooch was found near the spot where defendant's car was parked at Point Mugu.

On the morning of May 11 police officers of Los Angeles went to Ventura in connection with the case. Defendant repeatedly denied any knowledge of the whereabouts of Mrs. Berger or her body. The officers returned to Los Angeles with defendant and at defendant's direction drove to a point on

Menlo Avenue between Pico and Olympic. There in the street they found a large pool of blood, a smaller spot of blood, the blood-stained mate to defendant's glove which had been found in his car, and a blue ration token. All the mentioned blood stains were analyzed by a police chemist, who testified that they were human blood.

Off Point Mugu the ocean current flows southeast (toward Santa Monica). On May 17 Mrs. Berger's nude body was found in the sea near a point in Los Angeles County about 13 miles southeast of Point Mugu. The autopsy surgeon testified that she died as the result of six or seven deep head wounds made by the blows of a narrow instrument.

On May 12, to the police, and on May 13, to the police and Mr. Berger, defendant, who was imprisoned in the Los Angeles jail, gave the following account of Mrs. Berger's disappearance (her body had not then been recovered):

On the evening of May 10 defendant went to the Berger house. Mrs. Berger, when she admitted him, seemed distraught. She introduced defendant to a man called Harry, whose last name defendant did not learn. Defendant described Harry as about 45 years old, about 5 feet 10 inches tall, with dark reddish hair. Harry and Mrs. Berger were arguing. Harry asked defendant, "What do you think of a woman running away from me to Frisco and I want to take her with me." Defendant, feeling that this was a private quarrel, expressed his desire to leave. Mrs. Berger asked him not to go and at her suggestion the three went to defendant's car. Mrs. Berger then said she would get her suit case to take to the railroad station. Defendant volunteered to get the suit case and asked for the key to her house, which she gave him. When defendant returned with the suit case Harry was in defendant's car scuffling with Mrs. Berger. Defendant pulled Harry from the car, knocked him to the ground, and defendant, with Mrs. Berger, drove away. Defendant stopped on Menlo Avenue to look for an apartment. There were no vacancies. Defendant returned to his car and found Harry sitting in it, wearing defendant's gloves (which defendant had left on the seat of the car), and hitting Mrs. Berger with a tire iron. Defendant and Harry fought. Mrs. Berger meanwhile was "hollering and screaming bloody murder" but no one came to the scene. (The west side of Menlo Avenue where defendant's car was parked was vacant; on the east side were apartment houses.)

As they fought, Harry asked defendant to take Mrs. Berger to a hospital. Defendant said, "the condition you have got her in, what will that get us?" Harry then suggested that they go to Santa Monica, where he knew a doctor. Harry had a car. He led the way, with defendant and Mrs. Berger following in defendant's car. They went first to Ocean Park, found no doctor, then went to Santa Monica, stopped, and defendant decided that Harry was not trying to find help for Mrs. Berger. Mrs. Berger suggested, "Let's go to the beach, maybe the air will make me feel better." Defendant recalled that he had once seen a first aid station up the coast and drove toward it. He became aware that a car was following him. At Point Mugu he turned off the lights of his car and drove off the highway to let the pursuing car pass. Harry "drives up in his car . . . and the first thing I knew they were scuffling again." Harry was seated in defendant's car with Mrs. Berger. Defendant struck Harry with the tire iron, pulled him out of the car, and Harry ran to his own car, which would not start. Defendant went to help Harry start his car and "I had quite a few drinks in me too and, instead of coming towards the car, I went the other way and when I came back, he was gone and she was." Defendant looked in his car and "all of her junk was still back there and her pocket book wide open there and I got out and the first thing I saw a Coast Guard," who questioned defendant, "and I got in a fight with him because I was afraid that he would turn me in."

After defendant on May 13 had given this account of the events of May 10 to Mr. Berger and police officers Lt. McGarry and Lt. McCreadie, McGarry questioned defendant as to certain improbabilities and matters left unexplained. Defendant's explanations were confused and involved him in further improbabilities. Defendant insisted that he did not know what had become of Mrs. Berger or her body. Lt. McGarry then stated, "I am accusing you, cold turkey before the man that has been kind to you [Berger]—that you took the man's wife out from her home and took all the personal belongings with the understanding that she was going to the depot . . . and, instead of that, you took her out and killed her, and now the man's entitled to know where the body is so he can give her a decent burial. . . . You know there wasn't any other man there." Defendant responded, "You weren't there to see it, were you?" To other, less bluntly accusatory statements de-

fendant gave similarly evasive responses. To the question, "What do you think happened to her?" defendant replied, "I don't know anything more about it than you do. . . . A detective should have an answer to that." Defendant's attitude during this interrogation by the police is further illustrated by the following responses to the officers' summarization of the circumstantial evidence against defendant: "If, as you say, you got that much on me, why try to get anything else? Why not send me to the gas chamber or chair and get it over with? It doesn't matter to me"; "Get me in the court and get it over with"; "Why don't you start the third degree? That's the usual routine." (In response to Lt. McGarry's questions, however, defendant said that he had been kindly and patiently treated by the police officers during his confinement in the Los Angeles jail.)

No person other than defendant who knew or knew of Harry has been found. The police have unsuccessfully sought such information from the time defendant first told them of Harry. (After a previous trial of this matter defendant moved for a new trial on various grounds, which did not include the ground of newly discovered evidence. Defendant's counsel, however, on oral argument of the motion stated, "I have just been informed by my client that the witness who is in the Army [and whom defendant had mentioned in his testimony] is now available. . . . [O]f course, I haven't had time to prepare an affidavit, but that witness will testify to the fact of this Harry." Such witness has not been produced by defendant.)

The admission in evidence of the accusatory statements to which defendant gave equivocal replies was not, in the circumstances, an abuse of discretion. The statements comprise recitals of competent evidence thereafter introduced against defendant at his trial, together with McGarry's direct accusation in the form of virtually inescapable inferences therefrom, made under circumstances which rendered the accusations not unjustified. Defendant had just completed a purportedly exculpatory explanation of Mrs. Berger's disappearance which McGarry and McCreadie quite probably considered fantastic. It appears that defendant's evasive replies were made pursuant to his concept of the privilege against self-incrimination, for in response to Lt. McCreadie's question, "Is the evidence right or wrong? If you are innocent we sure as hell don't want to prosecute you," defendant said, "A person doesn't have to say anything until he gets in court. It's

not compulsory." Defendant then refused to answer the question, "Do you want to deny it [the evidence]?" But defendant had freely admitted that he had been to the Berger residence on the night of May 10 and had left there with Mrs. Berger in his car, that she had been the victim of a vicious battery committed in his presence and had been with him as he drove from the scene of such battery to a spot some 50 miles away, where defendant, in a strikingly similar manner, committed a battery upon the Coast Guardsman Sneathen. Considering not only defendant's responses to the accusations but also his above recited admissions, his replies to other questions of the Coast Guard and police, and the other evidence which connected defendant with the crime, the admission in evidence of the whole conversation of May 12 among defendant, Berger, McCreadie, and McGarry appears to have been entirely proper. (*Cf. People* v. *Simmons* (1946), 28 Cal.2d 699, 711 et seq. [172 P.2d 18] ; *People* v. *Leary* (1946), 28 Cal.2d 727, 733 [172 P.2d 34] ; *id.* (1946), 28 Cal.2d 740, 746 [172 P.2d 41].)

Defendant is not represented by counsel on this appeal. The counsel who represented defendant at the trial sought and received permission to file an amicus curiae brief in which, without waiving other points, he presents two propositions which, he urges, are each sufficient ground for reversal.

He complains of the following instruction: "In determining the intention of the defendant at the time of the transaction complained of, it is important to consider the means used to accomplish the killing. The intent or intention is manifested by the circumstances connected with the offense, and the sound mind and discretion of the accused. All persons are of sound mind who are neither idiots, nor lunatics, nor affected with insanity. The willful use of a deadly weapon without excuse or provocation, in such a manner as to imperil life, generally indicates a felonious intent." Such instruction is obviously objectionable for various reasons, among them, in that it assumes that defendant killed deceased. As amicus curiae points out, "The Court should not, directly or indirectly, assume the guilt of the accused [or any fact to be determined by the jury], nor employ equivocal phrases which may leave such an impression." (*People* v. *Williams* (1860), 17 Cal. 142, 147; 8 Cal.Jur., Criminal Law, §§ 351, 352.) Since "the intention of the defendant at the time of the transaction complained of" and "the sound mind and discretion of the accused" are not material unless, as the instruction assumes,

defendant did "accomplish the killing," amicus curiae is correct in his contention that the instruction (for this reason alone and regardless of other objectionable features) should not be given in a case such as this, where defendant does not concede participation in the transaction. And this is so although the second sentence which assumes that the accused committed the offense is code law. (Pen. Code, § 21.)

But the case presented to the jury does not appear to have been a close one and no miscarriage of justice is shown as a result of the giving of the instruction. Viewing the instructions and the evidence as a whole we are satisfied that the jury could not have been misled but rather must have understood as they were told, that the defendant was "presumed to be innocent until the contrary is proved"; that "you are the sole and exclusive judges of the facts and of the weight of evidence"; and "you are to judge of the facts upon the testimony and other evidence produced here in court."

Amicus curiae urges that the provisions of the California Constitution (art. I, § 13, as amended 1934) and Penal Code (§ 1323) which permit comment by court and counsel upon a defendant's failure to explain or deny evidence against him, are unconstitutional. His arguments are those rejected by this court in *People* v. *Adamson* (1946), 27 Cal.2d 478, 486 et seq. [165 P.2d 3], and he presents them in order that defendant may preserve a right to claim the benefit of a decision favorable to the defendant in the Adamson case, which is now before the United States Supreme Court (—— U.S. —— [66 S.Ct. 1373, —— L.Ed. ——]).

The court, in instructing the jury as to what constitutes murder of the first degree (apparently inadvertently, in the light of its other instructions), erroneously included portions of disapproved former stock instructions declaring that "There are certain kinds of murder which carry with them conclusive evidence of premeditation . . . [etc.]," and that a man "can premeditate, that is, think before doing the act, the moment he conceives the purpose." Each of these two former stock instructions has been often condemned. (*People* v. *Bender* (1945), 27 Cal.2d 164, 182-185 [163 P.2d 8]; *People* v. *Valentine* (1946), *supra*, 28 Cal.2d 121, 134, 135; *People* v. *Bernard* (1946), *supra*, 28 Cal.2d 207, 211-212; *People* v. *Honeycutt* (1946), *ante*, p. 52 [172 P.2d 698].) In the present case they directly conflict with other, correct instructions which the court gave on the same subjects. "In-

consistent instructions have frequently been held to constitute reversible error where it was impossible to tell which of the conflicting rules was followed by the jury. [Citations.]'' (*People* v. *Dail* (1943), 22 Cal.2d 642, 653 [140 P.2d 828].) Upon the record in this appeal, however, the evidence shows that defendant beat Mrs. Berger to death in robbing her. Such a murder, as the jury were advised, is by legislative definition essentially and exclusively murder of the first degree. (*People* v. *Valentine* (1946), *supra,* 28 Cal.2d 121, 135; *People* v. *Bernard* (1946), *supra,* 28 Cal.2d 207, 211.) Neither of these last mentioned errors, therefore, appears to have contributed to the verdict.

Since no error which can reasonably be held to have prejudiced any substantial right of defendant appears, and as the evidence amply supports the verdict, the judgment and order appealed from are affirmed.

Gibson, C. J., Shenk, J., Traynor, J., and Spence, J., concurred. Edmonds, J., concurred in the judgment.