[Crim. No. 4725.   In Bank.   Nov. 6, 1946.]

THE PEOPLE, Respondent, v. THOMAS HILTON,
Appellant.

George Finucane and Gene Harris for Appellant.

Robert W. Kenny, Attorney General, Frank Richards, Deputy Attorney General, Lawrence M. Parma, District Attorney, David S. Licker, Assistant District Attorney, and Thomas P. Weldon, Deputy District Attorney, for Respondent.

SPENCE, J.—Defendant was convicted of first degree murder and was sentenced to pay the extreme penalty. Prior to the trial, defendant had withdrawn his plea of not guilty by reason of insanity. This appeal is automatic in pursuance of section 1239(b) of the Penal Code.

The commission of the murder was admitted by defendant. At the trial his confession was introduced in evidence. He did not take the witness stand in his own behalf, and he offered no defense. However, defendant claims that he was prejudiced by certain instructions given by the trial court defining the degrees of murder, their respective elements, and the burden of proof thereon. The challenged instructions are substantially the same as those which were condemned in the recent cases of *People* v. *Thomas,* 25 Cal.2d 880 [156 P.2d 7] ; *People* v. *Bender,* 27 Cal.2d 164 [163 P.2d 8] ; and *People* v.

*Valentine,* 28 Cal.2d 121 [169 P.2d 1]. But here, contrary to the situation in the cited cases, the evidence, including defendant's confession, stands uncontradicted and leaves no doubt whatever that the murder committed by defendant was murder of the first degree. Under these circumstances the verdict must be upheld pursuant to the constitutional mandate requiring that a judgment shall not be reversed because of the jury's misdirection "unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 4½.)

Defendant, a native of Santa Maria, is 29 years of age. He is unmarried, having been divorced from his former wife. He is a high school graduate and a truck driver by occupation.

Sue Fouts, the deceased victim, was a happily married woman 41 years of age and a resident of Corcoran in Kings County. She traveled to Santa Maria on December 2, 1945, for the purpose of caring for her mother, Mrs. Swearingen, who was 73 years of age and in ill health. About 5:30 p. m. on December 5, Mrs. Fouts' nephew, Allan Stewart, brought defendant to the Swearingen home for dinner and introduced him to Mrs. Fouts. Stewart and defendant had been together in the afternoon and had had some drinks.

Following dinner in the Swearingen home, Mrs. Fouts, Stewart and defendant went downtown and each had a highball. After they returned to the Swearingen home, Stewart left, saying that he thought he would go back downtown for a short time. About 8 o'clock in the evening Mrs. Fouts and defendant decided to return to the downtown section of Santa Maria and look for Stewart. When they arrived downtown, defendant, without authority to do so, secured the truck of his employer from a service station where it had been left for repairs. He and Mrs. Fouts rode about town and had a few drinks. About midnight they went to the Chew Cafe in Santa Maria, where Mrs. Fouts had some Chinese food and defendant drank some beer.

The evidence as to what transpired between that time and the time of the murder is found in defendant's confession, made on December 13 to the deputy district attorney. That confession was made in the presence of, and was transcribed by, a shorthand reporter who testified at the trial. Defendant stated that after leaving the Chinese cafe he drove Mrs. Fouts to the Rosemary Farm on the outskirts of Santa Maria. There

they stopped and talked about "juke box" records "and things." Then defendant drove on "a little ways" and again turned off the highway and stopped the truck. Previously he had told Mrs. Fouts that she should drive, and had said to her, "I ought to take you out and cut your throat." She had laughed, thinking that he was joking. After stopping the truck, defendant got out, walked around the side, and told Mrs. Fouts to move into the driver's seat. As she started to move over, defendant stabbed her in the throat with his pocket knife. She gasped; he stabbed "two or three times"; and her body fell forward and partially out of the truck.

Defendant said that he left the body lying upon the ground and proceeded to walk around the ranch for approximately half an hour. Then he returned to the truck, placed the body in it, and drove down the road to the home of one Jack Siler. He awoke Siler and requested the loan of a shotgun for duck hunting. Siler said that he did not have the gun. Defendant then proceeded to the home of one Tapscott in Santa Maria, with intent, so he stated, of there securing a gun to kill his ex-wife. Tapscott was not home. Defendant next drove out what is known as the Cuyama-Santa Maria Highway, a winding, narrow, mountainous road, which was familiar to him. At the widest point on this road he stopped, took the body from the truck, and deposited it down the side of a hill about 300 feet off the highway. He returned to the truck, and then decided to go back and disrobe the body so as to make its identification "a little slower." He proceeded to do this, and then drove on toward Bakersfield. He stopped at the first river crossing, where he threw his victim's clothes off the bridge. Subsequently some of the articles of clothing were recovered from the river by a searching party from the sheriff's office.

Along the road defendant stopped at a service station in McKittrick, where he tried to clean his clothes. He then continued on to Bakersfield, where his truck ran out of gasoline and he abandoned it on a side road. It was discovered there several days later by a deputy sheriff. The cab on the inside was covered with bloodstains. On the floor there was a small hand axe covered with bloodstains and traces of hair like that of Mrs. Fouts were found adhering to it.

From Bakersfield defendant hitch-hiked to Trona, where his ex-wife lived. His prime purpose was to kill her. He stayed around Trona for a few days and burglarized several houses in an attempt to find a gun with which to kill his ex-wife.

He did not succeed in securing one or in finding her. He then hitch-hiked to Lone Pine. He assaulted one man who gave him a ride, striking the man's head with a bar of metal. He attempted to commit suicide, using the same knife with which he had killed Mrs. Fouts, but he slashed his wrists too high to have a fatal effect. He was arrested by a deputy sheriff at Lone Pine, Inyo County.

Defendant said that he had no reason to kill Mrs. Fouts, and he denied that there had been any sexual relations between them or any advances on his part. Whether there had been sexual relations could not be proved because of the extended time the body had remained exposed on the mountainside before it was discovered. Defendant stated that the liquor he drank did not affect him. He further stated as follows:

"Q. When did you make up your mind to kill her? A. About a couple hours before then. Q. While she was up at her house? A. No, it was when we were coming down town. Q. What caused you to decide to kill her? A. Oh, I got to thinking. Q. Thinking about what? A. I don't know if this is all necessary on this case or not. Q. Well, we would like to know if you could tell us. A. I have it all in my other confession. Q. You can go ahead and tell us that. A. I had a lot of trouble with my wife; she is my ex-wife, and she has been bothering me for quite awhile. Q. Did you tell Sue Fouts about your trouble with your wife? A. Yes, quite a bit of it. Q. What did Mrs. Fouts tell you? A. She just more or less said it was trifling. Q. Did she tell you to go back to your wife? A. No, just to forget it—she told me not to let it bother me. Q. Did that cause you to get mad at her? A. Oh, I been thinking for a couple weeks—I been thinking for a year of killing my wife. Q. Why were you mad at your wife? A. She had had me arrested ten times. Q. For what? A. Five times on disturbing the peace charges, one drunk, one kidnapping, one rape, one insanity, and one simple assault. Q. Where did this all happen? A. In Trona. . . . Q. Who did you commit this rape on? A. I didn't; I was acquitted of the charge. She brought all these charges at different intervals. Q. This insanity—what was that? A. She tried to have me committed to Patton. I was adjudged sane. Q. You were adjudged sane and they turned you loose; is that true? A. Yes. . . . Q. Getting back to Mrs. Fouts, how long had you known Mrs. Fouts? A. Probably five or six hours. Q. Was Wednesday, the 5th of December, 1945, the first day you met her? A. Yes. Q. That was the first time in your life that you had ever seen

her; is that true? A. Yes. Q. When did you make up your mind to kill her? A. Subconsciously maybe when I was walking down from the house. Q. What caused you to get that idea in your mind, that you wanted to kill her. A. I always regretted I had not killed my wife when I had the opportunity; I was all mixed up. Q. Mrs. Fouts never said anything or did anything to you, and you had only met her four or five hours before? A. Yes. . . . Q. Did Mrs. Fouts say anying to you when you stabbed her? A. She gasped. . . . Q. As a matter of fact, she didn't know you were going to stab her? A. No. . . . Q. When you left the Swearingen house with Sue Fouts what did you tell her you were going to do? A. I don't know. We were both feeling good and were going to go down and look for Allan; he had left early. Q. When you left the house did you intend at that time to kill her? A. Subconsciously; it might have been in the back of my mind. Q. You definitely made up your mind about 9 :30 at one of these bars? A. When I got the truck, yes. Q. Did you decide where you were going to kill her—at what place? A. Yes. Q. When you started driving out on East Main Street to the Rosemary Farm you definitely made up your mind you were going to kill her. Is that true? A. Yes. . . . Q. Just how much did you have to drink that night before you killed Sue Fouts? A. I started drinking about nine o'clock that day. Q. But you knew what you were doing all the time? A. Yes. Q. You weren't drunk? A. No. Q. And you weren't drunk when you killed her? A. No. Q. You knew what you were doing? A. Yes. Q. What reason did you have? Just tell us the reason, Mr. Hilton, why you killed her. Just tell us in your own words what the reason was. A. Like I said, I knew for a year, I definitely planned to kill my wife. I had it in my mind this Fall; it was always in my mind, and it kept getting later and later and I kept thinking about it; that's all I know, and I know that that day, why, it was on my mind all the time. Q. It is true that when you start drinking you get an inclination to kill some one? A. No, it has always been my wife I wanted to kill. Q. You do get that idea when drinking? A. It's worse when I drink. . . . I had been drinking all day, and I was thinking I ought to get that gun, borrow one from Tap or some one on the pretext of going hunting.''

In view of the constitutional mandate (art. VI, § 4½), the foregoing uncontradicted evidence must be borne in mind in considering defendant's sole contention on this appeal, which is that ''The trial court erred to the prejudice of defendant

in instructing the jury relative to the elements of the two degrees of murder and the burden of proof thereon.'' It would serve no useful purpose to set forth the challenged instructions for, as above indicated, said instructions were substantially the same as those which were discussed and were held to be erroneous in *People* v. *Thomas,* 25 Cal.2d 880 [156 P.2d 7]; *People* v. *Bender,* 27 Cal.2d 164 [163 P.2d 8]; and *People* v. *Valentine,* 28 Cal.2d 121 [169 P.2d 1]. It therefore appears that the giving of the challenged instructions constituted error, and we turn to the question of whether the error should be held to be prejudicial.

Defendant concedes that ''the crime stood admitted and the malice aforethought was unchallenged'' and he further concedes that the evidence ''was sufficient to sustain a verdict of murder in the first degree.'' As we view the record, however, there were many other facts which stood admitted and unchallenged, which last mentioned facts pointed unerringly to and impelled the conclusion that the murder was murder of the first degree. Thus it appears that it was some time after midnight on the night in question that defendant committed a brutal, unprovoked murder of a woman he had known but a few hours. Despite some drinking, defendant admitted that he was not ''drunk'' and that he ''knew what [he was] doing all the time.'' With respect to the actual killing, the evidence is summarized in defendant's brief where it is stated: ''The accused herein admitted uncontradictedly that he determined to kill the decedent and walked around to her side of the car with that specific intent.'' It is therefore clear that the uncontradicted evidence showed that the killing was ''willful'' as the stabbing was done with the specific intent to kill the deceased. But in *People* v. *Bender, supra,* 27 Cal.2d 164, at page 181, this court pointed out that ''it is obvious that the mere intent to kill is not the equivalent of a deliberate and premeditated intent to kill''; and in *People* v. *Thomas, supra,* 25 Cal.2d 880, at page 901, it was stated that ''The word 'deliberate' is an antonym of 'Hasty, impetuous, rash, impulsive' (Webster's New Int. Dict. (2d ed.)) and no act or intent can truly be said to be 'premeditated' unless it has been the subject of actual deliberation or forethought (id.)'' The question therefore remains as to whether the uncontradicted evidence showed that the murder was ''deliberate, and premeditated'' within the meaning of our statute defining murder of the first degree (Pen. Code, § 189). Here again the evidence is clear

and uncontradicted and leaves no room for doubt. While the actual killing occurred some time after midnight, defendant admitted that he had "definitely made up [his] mind about 9:30" to kill Mrs. Fouts "when [he] got the truck"; and further that "subconsciously" that intention "might have been in the back of [his] mind" when he and Mrs. Fouts left the Swearingen home about 8 o'clock that evening. He further admitted that before leaving Santa Maria, he had determined upon the place where he would carry out his nefarious plan and that he had thereafter driven to that place. Manifestly, the killing had been the subject of actual and prolonged deliberation and forethought by defendant, the specific intent to kill the deceased having been formed about three hours before the actual killing and having been adhered to throughout the intervening time. Under these circumstances, the killing could not be regarded otherwise than as an act that was "willful, deliberate, and premeditated." (Pen. Code, § 189.) As we view the uncontradicted evidence presented, the jury could not properly have arrived at any verdict other than a verdict finding defendant guilty of murder of the first degree, and the only real question presented for the jury's determination was that of the penalty to be imposed. We therefore conclude that the error in the challenged instructions, dealing with the subject of the degrees of the murder, may not be treated as prejudicial.

The foregoing conclusion is not in conflict with the decisions in the Thomas, Bender, and Valentine cases cited above and is in line with our recent decision in *People* v. *Bernard,* 28 Cal.2d 207 [169 P.2d 636], where substantially similar instructions were given but were held not to have been prejudicial. In that case it was shown without conflict that the killing was committed in the perpetration of a robbery and by means of lying in wait. There, as here, the undisputed facts showed that the murder was murder of the first degree (Pen. Code, § 189). It therefore appears appropriate to conclude here with the concluding language found in the Bernard case at page 214: ". . . Where the facts impel a conviction of murder of the first degree . . . and do not admit upon any view of the evidence of a finding other than of murder of the first degree, there is no occasion whatsoever to give instructions as to the differences between the degrees of murder. Hence, although the instructions as to such differences were manifestly erroneous, the errors cannot have prejudiced the appeal-

ing defendant." (See, also, *People* v. *Peterson, ante,* p. 69 [173 P.2d 11]; *People* v. *Honeycutt, ante,* p. 52 [172 P.2d 698]; *People* v. *Dorman,* 28 Cal.2d 846 [172 P.2d 686].)

The judgment is affirmed.

Gibson, C. J., and Shenk, J., concurred.

EDMONDS, J.—As I read the record in this case, the challenged instructions did not prejudice the defendant and, for that reason, I concur in the affirmance of the judgment.

CARTER, J.—I dissent.

It is an unwarranted invasion of the province of the jury to hold that defendant was not prejudiced by the erroneous charge merely because, in the opinion of a majority of this court, the evidence "leaves no doubt whatever that the murder committed by defendant was murder of the first degree." The fact that concededly the evidence "was sufficient to sustain a verdict of murder in the first degree" is beside the point. Whether upon that evidence defendant should have been adjudged guilty of first degree murder or of a lesser crime, or acquitted, was for the jury and the jury alone to say. It is not within the power of a trial court, even upon uncontradicted evidence, to direct a verdict of guilty in a criminal case, nor is it within the power of an appellate court to direct such a verdict by indirection. Yet the majority opinion does just that in its conclusion that "As we view the uncontradicted evidence presented, the jury could not properly have arrived at any verdict other than a verdict finding defendant guilty of murder of the first degree, and the only real question presented for the jury's determination was that of the penalty to be imposed. We therefore conclude that the error in the challenged instructions, dealing with the subject of the degrees of the murder, may not be treated as prejudicial."

Defendant's uncontradicted account of the manner in which the killing occurred left for determination by the jury but one real issue (other than punishment), and it was upon that issue, deliberation and premeditation, that the utterly confusing and erroneous instructions had bearing. The effect of the erroneous charge was therefore to take from the jurors the one matter to be determined by them. In other words, the undisputed facts showed that defendant's crime was murder of the first degree, if his specific intent to kill the deceased

was carried out with deliberation and premeditation. Whether these latter elements were present was the vital question for the jury under proper instructions. If the jurors were to be instructed in a vein which emphasized the rapidity with which thoughts may follow each other, fairness required a further instruction placing at least equal emphasis on the true meaning of the terms deliberation and premeditation. As stated in *People* v. *Bender,* 27 Cal.2d 164, 185 [163 P.2d 8]: ". . . While the jury may be told that the brain can function rapidly they must not be misled into thinking that an act can at the same time be hasty, hurried, and deliberate, or impulsive, unstudied, and premeditated. The extent of the reflection in every case, if it is to pass the test, must fairly and reasonably meet the ordinary and unquestioned significations of the test words. It is irrefragable that (in cases of the type now before us) the statutes of California purport to authorize putting a person to his death only where his act of killing was truly deliberate and premeditated; i. e., was murder of the first degree."

From defendant's confession and the absence of any other evidence of motive it would seem that the murder was the result of his confused association of his rancor against his ex-wife with all women, so that in giving vent to his intense desire to kill his ex-wife, he stabbed Mrs. Fouts. There was apparently nothing to break this confused conception during defendant's prolonged spree of brooding, drinking, and visiting with Mrs. Fouts. It is true that the evidence, if submitted to the jury under proper instructions, would have supported a verdict of murder of the first degree, but under that evidence it would also have been possible for the jury to conclude that the murder was of a lesser degree in that, since defendant had seen and been introduced to Mrs. Fouts for the first time only a few hours before the killing, apparently the intent to substitute her as a victim in place of the ex-wife, was not arrived at as the result of a dispassionate, cool, and deliberate premeditation, but was the result of an impulse engendered during the short period the two were together. In short, had the jurors been properly instructed, they might or might not have concluded that the killing was "willful, deliberate, and premeditated," as those terms are used in the statute defining murder of the first degree (Pen. Code, § 189). A lesser verdict returned by them could not have been disturbed.

The jurors should have been told in substance that ''Neither the statute nor the court undertakes to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent which is truly deliberate and premeditated. The time would vary with different individuals and under differing circumstances. The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly, but the express requirement for a concurrence of deliberation and premeditation excludes from murder of the first degree those homicides (not specifically enumerated in the statute) which are the result of mere unconsidered or rash impulse hastily executed.'' (*People* v. *Bender,* 27 Cal. 2d, *supra,* 184-185; *People* v. *Thomas,* 25 Cal.2d 880, 900 [156 P.2d 7].)

It marks no innovation in the law to state that even where there is undisputed evidence of first degree murder, convincing in the eyes of an appellate court, erroneous instructions which bear vitally upon the proper definition of the crime, must be deemed to have been prejudicial. Such has always been the law of this state. Thus it is said in *People* v. *Valencia* (1872), 43 Cal. 552, at p. 556: ''We are not justified in saying that the error [an instruction omitting from the definition of murder in the first degree the essential qualities of deliberation and premeditation] was productive of no injury to the defendants, because we may be satisfied that the jury ought to have found from the evidence, as they did, that the defendants are guilty of murder in the first degree. The question as to the deliberation and premeditation of the defendants is one which is peculiarly the province of the jury to determine; and should we sustain the charge of the Court, because of the apparently satisfactory character of the evidence, that question would virtually be withdrawn from the jury.''

Again it was said in *People* v. *Chew Sing Wing* (1891), 88 Cal. 268, at page 270 [25 P. 1099] : ''There is no question arising in a trial for murder more peculiarly or purely one of fact than the one whether the killing was done with deliberation and premeditation, or in the decision of which so much is necessarily left to the sound sense, discretion, and experience of the jury, who, under the constitution, are made the exclusive triers of that issue. In *People* v. *Ah Lee,* 60 Cal. 86,

this court said: 'And we think it to be well settled in this state that it was error to instruct the jury that there were no circumsances in the case to reduce the offense below that of murder in the first degree. The question whether the killing was perpetrated with the deliberation and premeditation necessary to constitute it murder in the first degree was one which it was "peculiarly the province of the jury to determine" '. . . . Nor can this court weigh the testimony for the purpose of determining whether the verdict of the jury is not right upon the evidence [quoting from *People* v. *Valencia, supra*]."

Here the court did not submit to the jury any issue of fact whatsoever on the question of degree; not even in the erroneous instructions as to what would constitute premeditation and deliberation were the jurors permitted to determine any issue of fact. They were told that if there existed in the mind of the defendant at the time of the slaying "the specific intent to take life" then the offense "would of course be murder of the first degree." Defendant, by his own admission, conceded the existence of such specific intent. That fact never was questioned by the defendant. Hence the instruction that if that specific intent existed the offense "would of course be murder of the first degree," left the jury no possible alternative, unless they directly disobeyed that instruction, but to return a verdict of murder of the first degree.

In this case, therefore, there was not merely error in instructions, but a total failure, in effect, to accord the defendant a trial by jury.

For the foregoing reasons I would reverse the judgment.

Schauer, J., concurred.

TRAYNOR, J.—I dissent.

I do not agree that "the jury could not properly have arrived at any verdict other than a verdict finding defendant guilty of murder of the first degree." In my opinion the jury could properly have arrived at a different verdict, and it is not improbable that it would have done so had it been correctly instructed with respect to premeditation. The jury might reasonably have concluded that because of the confused state of defendant's mind he did not act with premeditation.