[Crim. No. 36. Fifth Dist. Dec. 20, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. DONNELL COOLEY, Defendant and Appellant.

182

P. Basil Lambros and Samuel Z. Winnikoff for Defendant and Appellant.

Stanley Mosk, Attorney General, Barry L. Bunshoft and Raymond M. Momboisse, Deputy Attorneys General, and Kit L. Nelson, District Attorney, for Plaintiff and Respondent.

CONLEY, P. J.—The defendant, Donnell Cooley, known as Spade Cooley in the amusement world, was convicted by a jury of murder in the first degree for the killing of his wife, Ella Mae. Thereafter, he withdrew his additional plea of not guilty by reason of insanity and waived a jury with respect to fixing the penalty for his crime. The trial judge sentenced him to life imprisonment. There was no motion for a new trial. A notice of appeal was filed in due course.

We shall be as concise as reasonably possible in stating the significant facts shown in the more than 2,750 pages of the reporter's transcript. In this connection we must keep in mind the rule applicable to appellate courts in the review of a criminal record on appeal.

The Supreme Court states in *People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778]:

''The rule applicable where there is evidence, circumstantial or otherwise, that a crime has been committed and that the defendant was the perpetrator thereof, has been many times reiterated by the reviewing courts of this state as follows: The court on appeal 'will not attempt to determine the

weight of the evidence, but will decide only whether upon the face of the evidence it can be held that sufficient facts could not have been found by the jury to warrant the inference of guilt. ▮▮ For it is the function of the jury in the first instance, and of the trial court after verdict, to determine what facts are established by the evidence, and before the verdict of the jury, which has been approved by the trial court, can be set aside on appeal upon the ground' of insufficiency of the evidence, 'it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below. . . . ▮▮ We must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence, and then determine whether such facts are sufficient to support the verdict.' ▮▮ If the circumstances reasonably justify the verdict of the jury, the opinion of the reviewing court that those circumstances might also reasonably be reconciled with the innocence of the defendant will not warrant interference with the determination of the jury." (See also *People* v. *Osslo,* 50 Cal.2d 75, 84-85 [323 P.2d 397]; *People* v. *Daugherty,* 40 Cal.2d 876, 885 [256 P.2d 911]; *People* v. *Reed,* 38 Cal.2d 423 [240 P.2d 590]; *People* v. *Cullen,* 37 Cal.2d 614 [234 P.2d 1]; *People* v. *Jones,* 36 Cal.2d 373 [224 P.2d 353]; *People* v. *Robillard,* 55 Cal.2d 88, 93 [10 Cal.Rptr. 167, 358 P.2d 295]; *People* v. *Wein,* 50 Cal.2d 383, 398 [326 P.2d 457]; *People* v. *Eggers,* 30 Cal.2d 676 [185 P.2d 1]; *People* v. *Perkins,* 8 Cal.2d 502, 510 [66 P.2d 631]; *People* v. *Tom Woo,* 181 Cal. 315, 326 [184 P. 389]; *People* v. *Stephens,* 66 Cal.App.2d 755 [152 P.2d 1019]; *People* v. *Wright,* 94 Cal.App.2d 70 [210 P.2d 263].)

In view of the foregoing rule, it is inevitable in reviewing the long record that we examine with more particularity the evidence of the People tending to show the guilt of the defendant rather than the proof supporting his theory of innocence.

### The Evidence

The appellant, Spade Cooley, "the King of Western Swing," had been a well-known bandleader, musician and television actor. He first met Ella Mae Cooley in 1943, when he hired her to sing with his band; in 1945 they married, after he divorced his first wife.

In the year 1946, just before the birth of their first child, Melody (who was an eyewitness against her father upon the

trial), the victim believed that she had discovered the appellant with another woman in their home; when she proceeded to pack her belongings with the intention of moving to her sister's home, he warned her that if she did leave him he would find her and kill her. In the year 1950, at the home of her sister, the appellant twisted her arm behind her while she screamed, "Don't let him take me, don't let him take me"; at that time when her brother-in-law attempted to intervene, the appellant struck him.

Sometime later, on a cruise to Catalina Island, the appellant struck his wife and forced her to kneel and apologize to their guests for something which had met with disfavor on his part. The record shows that during their life together the appellant had inflicted numerous beatings upon her and that on one occasion when he started to choke her she was forced to jump from an automobile. The appellant's daughter, Melody, testified that she had witnessed the appellant "slap around" her mother and threaten to kill her on numerous occasions and that he had often beaten her. On at least five occasions beatings were witnessed by a nurse and domestic-companion, and in one instance the nurse was forced to strike appellant with a eucalyptus log in order to stop him from continuing the assault. In February of 1961, Ella Mae stated that she was being kept a prisoner by her husband and that she was afraid of him, as he had threatened to kill both her and the children.

In the early part of 1961 Mrs. Cooley was hospitalized; she had been under a severe strain and was quite nervous; while hospitalized she expressed fear of her husband to her doctor on several occasions. During this period she retained a woman attorney to commence divorce proceedings; she told her attorney that her husband had often beaten her and that his physical abuse was growing worse; she said that she was in fear for her life, as appellant had told her he was going to kill her if she attempted to leave him and that he would kill their children if she tried to take them with her; the victim said she was afraid to return home; she said that she wanted no property but would be satisfied to get out with her life.

At about the same time Ella Mae began sending small increments of money to "Bud" Davenport and Luther Jackson with the understanding, they said, that the money would be invested in stock in their names in secret trust for her use after she obtained a divorce. While she was in the hospital in March the appellant telephoned and told one of the

nurses that he was coming to visit his wife; when a nurse's aide relayed the message to her she became hysterical and begged for a place to hide, and after the aide left the room, she locked herself inside the bathroom and refused to come out again until the nurse's aide identified herself and said that Cooley was not there.

Mrs. Cooley had telephone conversations with Davenport and Jackson while she was in the hospital, during which she told them she feared for her life because of the numerous beatings inflicted upon her and the threats made by the appellant. On March 11, 1961, while Davenport and the victim were conversing by telephone the appellant tried for a period of 45 minutes to reach her, and when he later questioned her about her protracted conversation and told her falsely that he had monitored the call, the victim replied, "So what, now you know." Appellant assumed that the victim was carrying on an illicit affair with Davenport, and he informed a business associate, Jerry Enfield, that Ella Mae had been having sexual relations with Davenport. Davenport and Jackson were living together and had visited the ranch on a number of occasions. Each of them denied on the witness stand that Mrs. Cooley had ever had sexual relations with either.

However, the appellant assumed, notwithstanding his belief that the two men were homosexuals, that she had been conducting an affair with Davenport, and the appellant then telephoned him shortly afterwards at 1 o'clock in the morning and told him that he was coming to "beat his teeth in" and to kill him. He did visit Davenport and Jackson at 3 a.m., accompanied by two friends and business associates, Jerry Enfield and Beal Whitlock. At that time appellant accused Davenport and Jackson of being homosexuals and falsely told them that he had tape recordings of all of Davenport's telephone calls to his wife. He then struck Davenport on the chin and told him that if he did not get out of the state he would kill both him and Ella Mae.

On March 13th the appellant confided to a friend of the family, the nurse Dorothy Davis, that his wife was leaving him for another man.

On the 21st day of March, 1961, appellant filed a divorce case, charging extreme cruelty. Two days later he requested an escrow officer of a bank to come to his home to notarize certain quitclaim deeds. Before this person arrived, the appellant beat his wife severely, and that night the victim

signed four deeds which transferred the property upon which they lived from joint tenancy to appellant's sole ownership. Each of these parcels of land was said to be worth $80,000, but each was heavily encumbered. Ella Mae was also induced to sign several deeds in blank.

On March 24th appellant telephoned to Anita Aros, who had been a violinist in his band, telling her that he was divorcing his wife and asking her to marry him as soon as he obtained a decree in Nevada; she accepted his proposal, although she later said she considered it a joke. Several days later he again telephoned her, saying they would be married in seven weeks; on that occasion he forced his daughter to tell Anita Aros that she wanted her for a mother.

Appellant made various telephone calls in which he accused his wife of carrying on an extramarital affair; he forced her by means of threats and beatings to confess this purported delinquency to numerous people, including her 14-year-old daughter; the defendant told Melody that her mother was a "whore" and a "slut" and that she had been going to motels and trailer parks with other men. On another occasion appellant dragged the victim to his car and started to drive away, but before he was able to go any great distance she jumped out of the car; it was going so slowly at the time that she was not injured.

On March 29th the appellant requested his business associate, Jarrold L. Enfield, to move the trailer in which he had been living near appellant's home to a point a mile away.

Appellant forced his wife to make telephone calls to various people and confess her purported extramarital affair; at times during these calls appellant would hit her. He required her to call the Antelope Valley Hospital to demand a record of her calls while she had been a patient there. During this period, while she was sitting in bed, the appellant kicked her in the stomach saying to Melody, "See she only cries when you hit her, she doesn't care what's happening." Mrs. Cooley expressed a desire to escape, but no one could or would help her. When appellant left the ranch in the early part of the evening on one occasion he took the speaking devices out of all of the telephones so that his wife could not call out. When he returned from a meeting of the Elks Club one night he told the victim he was going to take her to the home of Bobbie Bennett, his business agent in Los Angeles; she did not want to go, as she had told her daughter that each time he took her to Bobbie Bennett's house he would stop on the

way in the intervening mountainous country and beat her, and she expressed fear also that she would be held prisoner in the Bennett home. Appellant, however, dragged her out of the house and put her in his automobile.

On the following day, March 30th, Mrs. Cooley telephoned her sister, Elizabeth Kidwell, from the Bennett house in Los Angeles, saying that she was in "bad shape," that she needed a place to hide and that Mrs. Kidwell could expect a call shortly from some people who would try to effect an escape for her. However, she never saw her sister again.

On March 31st the appellant informed a nurse that the victim had jumped from a moving automobile. She had a black eye, brush burns on her arms and legs, and her ankle, coccyx and back were bruised.

On April 2nd the victim and the appellant were back at their home in Antelope Valley. She had a black eye, was drained of color and had an abrasion on her arm. She stated to her daughter that the appellant had pushed her from the car.

On the same afternoon, at about 4 o'clock, the nurse Dorothy Davis paid a visit to the ranch. Appellant showed the nurse the telephone bills which he told her were the victim's confessions. Mrs. Cooley confessed to her that she had been carrying on an extramarital affair.

Late on April 2nd, the appellant received a telephone call from William S. Lewis, the private investigator he had hired to get evidence for his divorce suit. Ella Mae spoke to the investigator on the telephone and stated that she had had intercourse with "Bud" Davenport twice. The appellant heard this confession and ordered the investigator to check out the information as to motels.

On April 3, 1961, the day of the homicide, Jarrold L. Enfield, business associate of the appellant, visited him at the ranch. The appellant informed him he now had proof of the victim's infidelity and produced a purported written confession, which stated, in her handwriting, that she had gone to a motel with two men, Davenport and Jackson. Enfield looked at the confession and said, "Yes, it's Ella Mae's handwriting, Spade, but I know how you got it." Appellant replied, "What difference does it make as long as it is true."

At 2 p.m. one Russell Kirsan arrived at the ranch. At that time a pickup truck was blocking one entrance to the Cooley ranch, and there was a chain across the other entrance. Kirsan entered the house, where he and appellant discussed busi-

ness matters, particularly the drafting of a check for $2,000 in payment of a debt owed to a Mr. Peterson. Shortly afterwards, L. C. Martin, appellant's foreman, arrived. Kirsan signed the payroll checks for the work crew. At that time appellant was dressed in a striped shirt with the shirttails out, khaki trousers and black boots. At appellant's request, Kirsan left to purchase a bottle of whiskey. Kirsan returned later in the afternoon and he, Martin and appellant each poured a drink.

At 4 p.m. Melody telephoned from the McWhorter home nearby, asking if she could spend the night there. Mrs. McWhorter spoke to appellant and told him she would be happy to have Melody and her little brother, Donnell, Jr., stay over night with her own children. Appellant asked if it would not be a great imposition. She replied that it would not. Appellant said, "Well, I needed this."

At 4:40 p.m. Chester Peterson, the contractor, arrived to collect his check for $2,000. Kirsan refused to sign a check in that amount, as checks of over $500 required the express approval of the board of directors of the corporation for which the work had been done. Appellant thereupon became belligerent, made heated statements to Kirsan that his action was ruining appellant's reputation for paying bills promptly, finally shoved him, challenged him to a fight and expelled him from the house. At about 5:30 p.m. appellant attempted to persuade Martin to accompany him to the trailer of Davenport and Jackson to watch him beat them. Peterson left about 5:30.

Appellant and Martin discussed certain projects under construction at the ranch. At 5:35 p.m. Ella Mae walked into the room and sat down in a chair, separated from appellant's chair by a coffee table. She looked pale; her left eye was black, her hair was "messy," she had no cuts under the chin, no cuts on the nose, and no other visible marks or bruises, and she appeared to be missing no hair on her head. Appellant kept asking Martin in her presence to go with him to beat up Davenport and Jackson, but Martin would not. He left the ranch at 5:45 p.m.

At 6 o'clock Ella Mae called Melody and asked her to come home so she could explain to her "what this was all about." Melody told her mother that she did not want to come home. Appellant then took the telephone. He said, "I know, Melody, you don't want to see your mother. You don't want to see her, this old rep, do you?" Melody replied that she did wish

to see her mother, so appellant told her to come on home. The girl asked Mrs. McWhorter to drive her to the ranch but to pick her up again no later than 20 minutes afterwards.

Appellant admitted on the stand that before Melody arrived he struck and knocked the victim to the floor while they were in the living room and that he also struck her while they were in the bedroom. The savagery of the attacks can be pieced together from the injuries inflicted and the physical evidence found at the scene. The victim's body was covered with multiple bruises and abrasions; her left eye was blackenend, her nose bruised, her lips bruised and split, there were cracks on the chin, injuries to her neck, shoulder, chest, hip, arms, wrist, legs; there was an abrasion on the right side of the right breast; the nipple was blackened and discolored and partially separated from the breast. There were bloodstains on the floor in the living room; a broken cup in the living room contained bloodstains and female hair which resembled the victim's; in the bedroom there were bloodstains on the floor in front of the desk, impact or splatter-type bloodstains on the pillow case, on the sheets and on the boxspring cover of the bed, and on a water tumbler on the desk; there were bloodstains on a rifle in the bedroom and on the upper part of an ashtray stand, as well as blood splatters on the bedroom walls and on appellant's trousers. Deep bruising of the muscles of the neck, a break in the hyoid bone and a break in the thyroid cartilage in front of the victim's windpipe indicate that she was strangled. A clump of hair forcibly removed from her head was found near the foot of the bed. There was bloody material in the victim's vaginal and rectal orifices and splits in both the vaginal and anal-rectal mucous membrane. A broom was found in the bedroom which contained a uniform deposit of mucus substance with some blood extending 5 or 6 inches down the handle. Four fragments of blond bloody hair were imbedded in the fibers of the broom handle, and this hair resembled the victim's. Expert testimony showed that these stains could not have been placed on the handle by hand contact. Contact bloodstains on the bedding were consistent with mutilation of the anal and vaginal area with the broom handle.

When Melody arrived at the house appellant was talking on the telephone, and she heard him say, "Beal, don't call the police." The evidence shows that there was a Beal Whitlock who was a friend and business associate of the appellant. Appellant's daughter testified that at that time he was

dressed in tan cord pants and black boots and that he was sweaty. Melody asked him, ''Are the police coming?'' He said, ''Yes, there will be some in here in a minute, all over here in a minute. Come here, I want you to see your mother.'' As they went through the living room Melody saw tables shoved up on one another, a broken glass on a table and a bottle of whiskey.

They entered the bedroom, but her mother was not there. Instead, she saw bloodstained sheets. Appellant walked into the bathroom and said, ''Get up Ella Mae, Melody is here.'' When the victim did not answer, appellant dragged her nude body out of the shower by the hair and banged her head twice on the floor, causing internal injuries and hemorrhaging. The victim uttered no sound and made no movement. Appellant said, ''Melody, I'll give you three minutes to get her off the floor or I'll kill her if you don't get her up.'' He went into the living room and began a countdown, calling out, ''One minute left,'' ''Half a minute left, Melody.'' Melody tried to raise her mother, but was unable to do so, as she was limp. Finally appellant said, ''Time's up, Melody,'' and he strode into the room with a rifle in his hand. He made his daughter sit down in a chair and said, ''All right, Melody, you are going to watch me kill her.'' With that statement, appellant stamped the victim in the abdomen with his boot. Contusions in the abdominal area indicate three applications of force; this stamping split the victim's abdominal aorta, and the resultant hemorrhage caused her death in approximately 20 minutes, in the opinion of expert witnesses. After he stamped on her, appellant stooped down by the victim and said, ''We'll just see if you're dead.'' He called her a ''slut.'' Then he knelt down and touched the nipples of both of her breasts with his cigarette.

Melody started to run, but appellant grabbed her and said, ''All right, I'll give you two more minutes to get her off the floor.'' Then the phone rang. Appellant answered it and carried on a conversation on it. Then he returned to the bedroom and said, ''Come on Melody I won't touch her any more, sexual wise.''

Appellant then took Melody into the living room, made her sit on his lap, kissed her passionately and touched her breast. He told her he was going to turn all his love over to her and to Donnell, Jr., as their mother had ''crushed him.''

Melody remarked that she would turn off the shower, and appellant told her to pour some water on the victim. Melody

did pour water on her mother's chest, as from the rattling sound she heard emanating from the victim's throat, she feared she would drown her if she bathed her face.

The girl returned to the living room. The telephone rang again. It was "Billy" Lewis, the private investigator. The appellant and Lewis discussed the latter's attempt to obtain evidence for appellant's use in his divorce action. Appellant was insistent that Lewis investigate motels appellant claimed the victim had stayed at with Davenport and Jackson. Although he seemed annoyed because Lewis had not performed his duty better, appellant was rational enough and calm enough to give him explicit instructions on the work he expected. When Lewis asked appellant if his wife could hear the conversation, he replied, "No, not at all."

While the defendant was talking to Lewis, Melody kept looking out of the window for Mrs. McWhorter, whose return she expected momentarily. When he ended his conversation, Melody told appellant that she thought she saw Mrs. McWhorter and didn't want her to come into the house. She kissed her father on the cheek hurriedly; as she ran from the house, appellant's parting words were, "Melody, don't tell the police anything. If you do, I might have to kill you." The girl thought she heard a shot behind her, so she said she hid back of Beal Whitlock's trailer, then ran across a field to Mrs. McWhorter, who was just arriving. Although she was crying hysterically, she told Mrs. McWhorter the details of the murder of her mother she had just witnessed.

After Melody left, appellant cleaned up some of the blood. Later in the evening Bobbie Bennett arrived. She was accompanied by one Ed Borglund. The three discussed business affairs. The appellant did not mention anything about the victim during the business discussion, but he went into the bedroom on one occasion to look at the victim. When he returned to the living room he told Bobbie Bennett that she was hurt, and the latter urged defendant to call a doctor, but he refused. Instead, he had Bobbie place a telephone call to the nurse Dorothy Davis in Los Angeles at 9 p.m. Bobbie told Dorothy that the victim had had an accident and that they needed her services at the ranch. Dorothy suggested to Bobbie that if the victim was seriously injured they ought to call a doctor and an ambulance.

Later in the evening "Billy" Lewis telephoned again. He informed appellant that he was unable to find evidence that the victim had stayed with Davenport and Jackson at the

motels appellant had told him to investigate. Appellant asked him to call the next day, and he then put Bobbie Bennett on the line. Lewis asked Bobbie what was happening at the ranch. She replied, "Well, nothing any too good." Then Bobbie asked Lewis to be prepared in case she called him for assistance later that night. Lewis asked, "Is there something cooking?" Bobbie replied, "Yes." Then Lewis asked, "Would this be an emergency thing?" Bobbie replied, "Yes."

Dorothy Davis arrived at the ranch at 11 p.m. No doctor or ambulance had been called. Appellant and Bobbie met her at the front door and told her the victim was in the bedroom. Dorothy went in to examine Mrs. Cooley, who was lying diagonally across the bed with her head near the pillow area and her body under a sheet and blanket. She could feel no pulse and heard no heartbeat, and she told appellant that Ella Mae was dead. Dorothy Davis first called the Antelope Valley Hospital, then the sheriff's department, in search of an ambulance. She told a deputy sheriff she feared the victim was dead. An ambulance was dispatched to the Cooley ranch.

Dorothy advised appellant to change his clothes. He was dressed at the time in tan trousers and socks. He put on a sport shirt, trousers and cowboy boots, and appellant put the tan trousers in the washing machine.

The ambulance arrived at 11:35 p.m. Appellant asked the driver to take her to the Tehachapi Valley Hospital. He went into the bedroom where he saw the body lying diagonally on the bed, wrapped in a blanket with her face exposed. He removed her from the bed with appellant's help, placed her on a gurney and took her into the ambulance. Appellant rode in the back of the ambulance; before leaving the ranch at 11:45 he executed a general power of attorney in favor of Bobbie Bennett. On the trip to the hospital appellant was calm and collected; upon arrival he informed the doctor there that the victim was badly injured and needed medical attention. The doctor found that the victim was dead. He so informed the defendant, who apparently showed no remorse but merely asked if the doctor was sure. At 3 o'clock in the morning of April 4, 1961, appellant made a voluntary statement to the sheriff's deputies, which was tape recorded and was later used at the trial.

Appellant's defense was twofold. First, he claimed that the victim had suffered her fatal injuries as a result of an accidental fall in the shower; secondly, he urged that he had

no intent to kill his wife, as he had blacked out when he learned the details of her alleged sexual relationship with Davenport and Jackson.

The first angle of the defense was completely discredited by the medical experts as well as by the testimony of Melody, as an eyewitness to the murder.

Appellant's second theory of defense, the contention that upon learning of the details of her alleged affair with Davenport and Jackson "rockets went off in his head" and that he lost consciousness of what he was doing and of his surroundings can scarely stand up in view of the fact that he knew generally of these alleged matters weeks before the time of the killing. He was sufficiently apprised of this purported relationship in the early weeks of March to cause him to order the two men to leave the victim alone and to strike Davenport and threaten to kill both him and Ella Mae. About the middle of March appellant insisted the victim telephone Davenport so that he could listen to their conversation and assure himself there had been no sexual liaison between them; the gist of the conversation caused him to believe there was in fact an illicit relationship. About March 15 appellant emptied the victim's handbag and discovered a receipt for a $200 money order. Mrs. Cooley confessed to appellant that she thought she was in love with Davenport and that she had been sending money to him to invest for her. She admitted that she had received numerous telephone calls from Davenport.

On March 17 Ella Mae confessed to appellant that she had been in love with Davenport, and he thereupon informed her that he would seek a divorce, after which she told him that she had herself previously consulted an attorney about the possibility of obtaining a divorce. That very day the appellant signed a complaint for divorce on the ground of extreme cruelty.

Later, Ella Mae told her parents in the presence of defendant that "she had been a very foolish and a very bad woman and that she had been giving [Davenport] money." Following this, appellant took her back to the ranch with him, and, according to the defendant, the victim on this trip jumped out of the car, sustaining injuries. However, he did not call a doctor.

On March 29th, while he was taking her to confront Davenport and Jackson, Mrs. Cooley once more jumped from the moving car, according to defendant's testimony, and she

again sustained injuries; the defendant did not call a doctor for her on this occasion either.

On Saturday, April 1, appellant hired a private detective for the purpose of obtaining evidence to "expose and humiliate" Davenport and Jackson. On the day of the murder, April 3, appellant questioned Ella Mae about going to a motel with the two men. When she admitted that she had done so, something "exploded" in his brain, according to his testimony. In spite of this, appellant did not strike the victim at that time. Rather, he conducted business in an apparently normal fashion with a partner and with other persons. Late in the afternoon, after all of his guests had departed, appellant saw the victim sitting on a long divan in the living room. He testified that he sat down in an easy chair across from the divan and when Ella Mae suggested that he looked hot, he removed his shirt, his boots and his socks. Appellant remembered that he had three drinks of whiskey during the day and had also taken three thorazine pills in the morning.

According to the defendant, his wife and he immediately began to discuss the impending divorce. She asked the appellant if he was going to keep hounding Davenport and Jackson, and said to him, "I'm not worth it," and that she would show him she was not worth it. She asked appellant to telephone Melody and have her return to the ranch so that she could tell them both what she had done, and the call to Melody was accordingly placed. Appellant testified in detail as to the victim's confession of her first meeting with Davenport and of their unnatural conduct at that time. Cooley said that he had no "conscious recollection" of then striking the victim, but that he must have done so, for she fell on the table and then to the floor. His next recollection, according to his testimony, was of the victim's sitting on the bed in the bedroom. He remembers vividly all of the next few events. He said that she said to him, "Now you think I don't love you, don't you?" She took his cigarette and said, "I'll show you how much I love you." He testified that, saying this, she opened her blouse and burned herself on the breast.

Next, appellant testified in detail to the victim's purported "love cult confession," and with respect to her alleged plan to go with Davenport and Jackson to La Jolla, or some other seaside location, and to aid them in founding a love cult colony. He also testified that she told in detail of her own initiation into the love cult. Appellant testified that he had no "conscious recollection" of his actions after the victim

described these sexual activities. He stated that he next recalls seeing her lying half on the floor and half on the bed, still conscious. As Melody would soon arrive, he asked Ella Mae if she wanted "to take a shower and try to cleanse herself as much as she could." Appellant saw the victim walk into the bathroom but did not see her go into the shower. The next sound appellant heard was a thud and breaking glass. He testified that he had no "conscious recollection" of what happened after he heard the crash.

The defendant recalled, so he said, that Melody assisted him in removing her mother from the shower and putting her on the bed, but he had no "conscious recollection" of what occurred while Melody was there. Thus, he had no "conscious recollection" of touching her breasts with a cigarette, as testified by Melody, or of stamping on her abdomen with his boot or mistreating her with the broom handle, or of having a gun in his hand. He had no "conscious recollection" of grabbing the victim by the hair when he pulled her out of the shower or of banging her head on the floor or of giving Melody a countdown to get her mother off the floor. He had no "conscious recollection" of speaking on the telephone to Beal Whitlock and telling him not to call the police or of telling Melody, "The police will be swarming all over this place," or of shouting, "Get up, Ella Mae, get up, Melody is here, tell her the bad things you told me." However, the appellant recalled, so he said, of telling Melody, as she left the house, that the victim was hurt badly from a fall in the shower and that she had burned herself on the breast with a cigarette. He also recalled cleaning away the blood in the shower and on the floor outside the shower with a rag sometime during the evening.

### Defendant's Contentions on the Appeal

The defendant and appellant makes the following claims on the appeal:

1. The evidence is insufficient to justify the verdict of first degree murder;

2. The court committed prejudicial error by permitting evidence of the decedent's state of mind;

3. The court erred in giving certain instructions and in refusing others;

4. The district attorney was guilty of prejudicial misconduct.

### PROOF OF MURDER IN THE FIRST DEGREE

The defendant claims that the evidence was insufficient to justify the verdict of guilty of murder in the first degree. In his brief appellant's counsel says: "Had the jury been properly instructed it is entirely conceivable that they would have found the defendant guilty of murder in the second degree or even manslaughter."

Murder is the unlawful killing of a human being with malice aforethought (Pen. Code, § 187). ▮ A homicide is murder of the first degree when the accused, as a result of deliberation and premeditation, intends unlawfully to take away the life of another. (Pen. Code, § 189; *People* v. *Martinez*, 38 Cal.2d 556, 560-561 [241 P.2d 224]; *People* v. *Bender*, 27 Cal.2d 164, 178 [163 P.2d 8]; *People* v. *Sutic*, 41 Cal.2d 483, 491 [261 P.2d 241]; *People* v. *Mason*, 54 Cal.2d 164, 168 [4 Cal.Rptr. 841, 351 P.2d 1025].) This means that a defendant must have weighed in his mind and considered the course of action he was taking, and after having considered the reasons for and against such course of action, chose to kill his victim. (*People* v. *Robillard*, 55 Cal.2d 88, 95 [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086]; *People* v. *Honeycutt*, 29 Cal.2d 52, 61 [172 P.2d 698]; *People* v. *Bender*, *supra*, p. 183.) ▮ However, direct evidence of malice or of a deliberate and premeditated purpose to kill is not required, but these elements may be inferred from proof of such facts and circumstances as furnish a reasonable foundation for such an inference and where the evidence is not at law insufficient, the matter is exclusively within the province of the jury as the trier of fact to determine. (*People* v. *Brubaker*, 53 Cal.2d 37, 40 [346 P.2d 8]; *People* v. *Cartier*, 54 Cal.2d 300, 305-306 [5 Cal.Rptr. 573, 353 P.2d 53]; *People* v. *Robillard*, *supra*, p. 95; *People* v. *Wells*, 10 Cal.2d 610, 617, 624 [76 P.2d 493]; *People* v. *Cook*, 15 Cal.2d 507, 514 [102 P.2d 752]; *People* v. *Rupp*, 41 Cal.2d 371, 382 [260 P.2d 1].)

Appellant asserts that his conduct was excusable as a result of provocation. ▮ In *People* v. *Taylor*, 197 Cal. App.2d 372, 380-381 [17 Cal.Rptr. 233], it is said:

"To be sufficient to reduce homicide to manslaughter, the heat of passion must be such as would naturally be aroused in the mind of an ordinary, reasonable person under the given facts and circumstances, or in the mind of a person of ordinary self-control. (*People* v. *Brubaker*, 53 Cal.2d 37, 44 [346 P.2d 8].) ▮ The primary question in determining whether homicide is voluntary manslaughter is whether the

defendant's reason was, at the time of his act, disturbed or obscured by some passion to such an extent as would render an ordinary man of average disposition likely to act rashly or without due deliberation and reflection, and from this passion rather than from judgment. [Citing cases.]

██ "Furthermore, before a homicide may be classified as voluntary manslaughter, it must appear that there was no 'cooling' period, that is, after the 'heat of passion' was reasonably and justifiedly engendered, 'hot blood had not had time to cool' before the fatal act was committed, that is, the act that engendered the 'hot blood' had occurred so shortly before the killing that reason had not had time 'to resume its empire.' (*People* v. *Wells*, 10 Cal.2d 610, 618 [76 P.2d 493].)

██ "In the final analysis, the existence of provocation and its extent and effect, if any, upon the mind of defendant in relation to the existence of malice is a question of fact for the jury. [Citing authorities.]"

The People urge that the testimony of Melody, Cooley's daughter, as to his acts in killing Ella Mae would of itself sustain a conviction of first degree murder, and that while this evidence alone establishes a wilful, deliberate, premeditated murder, there was more; the testimony that appellant heaped physical abuse upon the victim during their marriage, that she was in grave fear of him, that she was induced to sign deeds transferring her property to Cooley, that he proposed marriage to Anita Aros, tends to support a conclusion that the murder was wilful, deliberate and premeditated.

We agree with the respondent's observation that the truth of Cooley's claim that he lost his senses at the time of the explanation by his wife of details of the purported relationship between her and the two men, Davenport and Jackson, is open to serious doubt. Mr. Cooley admittedly thought Davenport and Jackson were homosexuals, and Ella Mae had on numerous occasions in the past made lurid confessions to Cooley, only subsequently to retract them. She had been confessing her alleged infidelity to the appellant for weeks, and Cooley himself had repeatedly told numerous people of Ella Mae's delinquency. Appellant testified that at noon on the day of the tragedy Ella Mae confessed that she had gone to a motel with both Davenport and Jackson; after this, appellant conducted business affairs with apparent calmness. Cooley carried on a conversation with his private investigator and discussed business problems with Bobbie Bennett after the injuries to Ella Mae were perpetrated.

Furthermore, the prosecution based its claim of murder in the first degree primarily upon the theory that the facts showed murder by torture. Murder which is perpetrated by means of torture is murder in the first degree. (Pen. Code, § 189.) ▇▇▇ In *People* v. *Martinez, supra,* 38 Cal.2d 556, 561, the defendant's wife died from burns after her husband threw gasoline on her and lit a match. The court said:

"Murder is so perpetrated when 'the assailant's intent was to cause cruel suffering on the part of the object of the attack, either for the purpose of revenge, extortion, persuasion, or to satisfy some other untoward propensity.' (*People* v. *Tubby,* 34 Cal.2d 72, 77 [207 P.2d 51]; *People* v. *Bender,* 27 Cal.2d 164, 177 [163 P.2d 8].) In the present case defendant had previously stated that he intended to 'do something bad' to his wife. The jury could reasonably conclude that when defendant set about to burn his wife with gasoline, his intention was to inflict cruel suffering as punishment or revenge on his victim."

In *People* v. *Gilliam,* 39 Cal.2d 235, 239 [246 P.2d 31], wherein one inmate of a jail killed another by beating and kicking him, the court said: "On the record the jury could justifiably conclude that the defendant had the requisite intent which would support the verdict on any or all of the theories submitted to it. Considering the deliberateness of his acts and statements, the time intervening since his drinking, and the length of time consumed in committing the assault, the jury could infer that the defendant knew what he was doing and that he committed the acts with homicidal intent. The jury could also conclude that responding to an unprovoked sadistic tendency he had the purpose and intent to cause cruel suffering on the part of the decedent, and that among the torturous acts of brutality he maliciously gouged the victim's eye with his heel. The evidence that the defendant did not desist until his victim stopped breathing supports the conclusion that he was alive when that kick was administered. The justification for the implied findings of the jury, which support the verdict of first degree on any or all of these theories, differentiates the result from that in *People* v. *Tubby, supra* (34 Cal.2d 72), and does not call for the application of that case nor of other cases on which the defendant relies."

In *People* v. *Tubby, supra,* 34 Cal.2d 72, 77, the case relied upon by appellant, the court said: "In determining whether the murder was perpetrated by means of torture the solution must rest upon whether the assailant's intent was to cause

cruel suffering on the part of the object of the attack, either for the purpose of revenge, extortion, persuasion, or to satisfy some other untoward propensity. The test cannot be whether the victim merely suffered severe pain since presumably in most murders severe pain precedes death.

''In this case the record is devoid of any explanation of why the defendant might have desired his stepfather to suffer. The only testimony concerning the relationship between the two men was that the deceased and the defendant were on amicable terms prior to the attack. . . . An indication that the defendant was in a 'fighting mood,' inclined to fight almost anyone and not primarily interested in causing the ultimate victim to suffer, is the fact that he offered to fight the arresting officer and had to be subdued by force. It is too apparent to admit of serious doubt that the unprovoked assault was an act of animal fury produced when inhibitions were removed by alcohol. The record dispels any hypothesis that the primary purpose of the attack was to cause the deceased to suffer. When death results under the circumstances here shown the homicide cannot be said to constitute murder by torture in the popular, dictionary, or legal sense. The evidence is therefore insufficient as a matter of law to support the verdict on the theory that the homicide was murder by torture.''

From Cooley's own testimony we gather that days and hours were spent in which he and Ella Mae Cooley discussed her indiscretions. His concentration on his wife's purported amorous activities can be believed; he sought people to whom she could confess; he had secured written confessions from her; he traced down and struck one of her ''friends.'' For days he mulled over in his mind thoughts of his wife's indiscretions. None of these things was present in *People* v. *Tubby*. The two cases are distinguishable.

An intent that the victim should suffer may be inferred from the condition of the victim's body. (*People* v. *Misquez,* 152 Cal.App.2d 471, 480 [313 P.2d 206].) The pictures in evidence and the expert testimony would lead the jury to infer that it was the appellant's intention that she should suffer cruelly. The body had fresh bruises and abrasions on it from head to toe, and there was testimony that the essential wounds could not have been caused either by a fall in the shower or by a previous fall from an automobile. The body had dried blood at the hairline, a black eye, discoloration of the nose, dried blood across the nose, discoloration of the lips, small splits in the lips, small cracks on the chin, dis-

coloration of the neck, an abrasion in the breast area, bruises on the arm, ribs, hips, abdomen and hair missing from the top and forward part of the head. There was bleeding above the surface of.the brain, as shown by the autopsy. The body had complex abdominal injuries, particularly the retroperitoneal hematoma; this hemorrhage, due to a split in the abdominal aorta, was the cause of death, in the opinion of the People's experts. Aside from any testimony by Melody, the eyewitness, who said that she saw the appellant drag the victim by her hair, bang her head against the floor, stamp her in the abdomen with his booted foot and put a cigarette on the victim's breast, the condition of the body indicates that Ella Mae was badly injured, that a nipple of her breast was partly torn away, that a broom handle had been forcibly thrust into both her vaginal and anal orifices, that she was choked, her head banged violently on the floor and her abdomen stamped upon. "It was for the jury to resolve conflicts in the evidence and to determine the inferences to be drawn therefrom [citing cases]." (*People* v. *Baker*, 42 Cal.2d 550, 563 [268 P.2d 705].) We conclude readily that there was overwhelming evidence of killing by torture, and that the murder was of the first degree.

### EVIDENCE OF DECEDENT'S STATE OF MIND

Appellant argues that the court committed error in allowing several witnesses to testify to statements made by the decedent with respect to the fear which she entertained of her husband. Amy Fixler, the attorney at law who consulted with Ella Mae in the hospital, was permitted to testify to her statements that she was in fear of her life because of threats made by the defendant. Elizabeth Kidwell, the decedent's sister, related a telephone conversation on the Thursday prior to Ella Mae's death concerning her fear of appellant; she was also allowed to testify to an incident that occurred on a trip to Catalina Island several years before and also to a conversation that occurred in 1950. The witness Jackson related statements made by Ella Mae that she was in fear for her life, and Gloria Baltes stated on the witness stand that the decedent had told her that she would like to get away for a rest but that she was being kept a prisoner by the defendant. The trial judge was careful to instruct the jury that the evidence of Ella Mae's fears was received solely for the purpose of showing the state of mind of the decedent.

 *People* v. *Merkouris*, 52 Cal.2d 672, 682 [344 P.2d 1], and *People* v. *Atchley*, 53 Cal.2d 160, 172 [346 P.2d 764],

hold that as an exception to the hearsay rule evidence may be given under proper circumstances of statements made by a murder victim to show fear of the defendant. This rule has been clarified and somewhat restricted in *People* v. *Hamilton*, 55 Cal.2d 881, 893-894 [13 Cal.Rptr. 649, 362 P.2d 473], in which the Supreme Court says:

"Undoubtedly, in a proper case, and in a proper manner, testimony as to thé 'state of mind' of the declarant, where there is an issue in the case is admissible, but only when such testimony refers to threats as to future conduct on the part of the accused, where such declarations are shown to have been made under circumstances indicating that they are reasonably trustworthy, and when they show primarily the then state of mind of the declarant and not the state of mind of the accused. But there are and should be rigid limitations on the admission of such testimony. One of these limitations is that such testimony is not admissible if it refers solely to alleged past conduct on the part of the accused."

Reliance is also placed by appellant on the holding in *People* v. *Purvis*, 56 Cal.2d 93, 98 [13 Cal.Rptr. 801, 362 P.2d 713], in which the court speaks as follows: "Defendant contends that certain hearsay statements of Hazel Wilson were also improperly admitted. Witnesses testified that Hazel Wilson had told them that she was afraid of defendant because he had killed his wife. In the trial for the murder of Hazel Wilson defendant also claimed that he had killed without premeditation. There was no issue of either identification or self-defense. There was thus no ground on which Hazel Wilson's fear of defendant could be admitted even to prove defendant's guilt let alone to aid the jury in fixing the penalty. It may be that an inference as to the victim's conduct can be drawn from the victim's state of mind, but certainly no permissible inference can be drawn therefrom as to defendant's character or actions. Standing alone, the error in admitting this evidence might not be prejudicial. Considered, however, with the error in admitting the highly prejudicial hearsay statements of Eleanor Purvis and the improper use of the hearsay in the prosecutor's argument to the jury the conclusion is inescapable that the purpose of introducing such testimony was to inflame the jury against defendant."

 Here, the state of mind of the victim—namely, that she feared the defendant because of his threats to kill her, was of help to the jury in determining whether the People's contention of murder by torture or the defendant's claim of

death by accident was correct. The trial court carefully instructed the jury as to the restricted significance and effect of the evidence. And it should be noted that much of the testimony given by the witnesses on this general subject was developed on cross-examination by the appellant; ▮▮▮▮ appellant's counsel went further and introduced evidence of brutality on the part of appellant; consequently he now has no right to assert error to the extent of the answers given in response to his own interrogation. (*People* v. *Buzzell,* 15 Cal. 2d 654, 659 [104 P.2d 503]; *People* v. *Fitzsimons,* 189 Cal. App.2d 682, 685 [11 Cal.Rptr. 471].)

▮▮▮▮ Some of the evidence cited shows past acts of physical violence committed by the appellant upon Ella Mae; such evidence was properly admissible as showing the prior course of conduct of appellant toward his victim; it tends to show motive and casts further light on the question whether death was the result of appellant's action or of an accident. (*People* v. *Lint,* 182 Cal.App.2d 402, 415-417 [6 Cal.Rptr. 95]; *People* v. *Cartier, supra,* 54 Cal.2d 300, 311.)

▮▮▮▮ Considering the whole record on the subject, we conclude that there was no prejudicial error in the introduction of evidence which showed the victim's fear of appellant's future actions.

## THE INSTRUCTIONS

▮▮▮▮ Appellant contends that the court erred by refusing an instruction defining murder and the element of malice; the assertion is made that as a consequence the jury had no standard by which to distinguish between first degree murder and manslaughter.

The proposed instruction was CALJIC 301; it is correct in form and could well have been adopted. However, the instructions actually given sufficiently in effect cover the same ground, and the jury could not have failed to understand from the whole charge the elements involved in first degree murder. It is not prejudicial error to refuse an instruction if the subject involved is substantially covered by the charge actually given. (*People* v. *Eggers,* 30 Cal.2d 676, 688 [185 P.2d 1]; *People* v. *Mathews,* 163 Cal.App.2d 795, 801-802 [329 P.2d 983]; *People* v. *Eaton,* 60 Cal.App. 612, 613 [213 P. 275]; *People* v. *Latona,* 2 Cal.2d 714, 727 [43 P.2d 260]; *People* v. *Hall,* 220 Cal. 166, 173 [30 P.2d 23, 996]; *People* v. *Morales,* 26 Cal.App.2d 442, 444 [79 P.2d 771].)

The court drew a clear and definite distinction between the degrees of murder and the various types of manslaughter. The

jury was instructed that in order to constitute a homicide, an unlawful act must be the proximate cause of death; that malice is an essential element of murder; that in order for a murder to be of the first degree, the killing must be wilful, deliberate and premeditated; that to constitute first degree murder "... the killing must be accompanied by a clear, deliberate intent to take life. The intent to kill must be the result of deliberation and must have been formed upon a pre-existing reflection and not under a heat of passion or other condition such as precludes the idea of deliberation"; that to constitute first degree murder, a defendant must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, decide to and commit the unlawful act causing death.

These instructions in effect advised the jury that malice was an element of first degree murder, but limited the malice to express malice as defined by Penal Code section 188. Thus, although not complete in that they did not cover implied malice, the shortcoming is beneficial to the appellant, as it limited the possible basis for a finding of malice. If there was any error in this regard, it cannot be relied upon by the appellant, as it was favorable to him.

The court also fully instructed the jury on murder by torture, and pointed out that such murder was of the first degree.

The jury was informed that second degree murder must be distinguished from both first degree murder and manslaughter. That in the case of second degree murder, the killing must be committed with malice aforethought, but that it is not wilful, deliberate and premeditated and not committed by means of torture. More particularly, they were informed that:

"In practical application this means that the unlawful killing of a human being with malice aforethought but without a deliberately formed and premeditated intent to kill is murder of the second degree in any of the following cases:

"When the killing results from an unlawful act the natural consequences of which are dangerous to life, which act is performed deliberately by a person who knows that his conduct endangers the life of another; or,

"When the circumstances [at]tending the killing show an abandoned or malignant heart, or when the killing is done in the perpetration or attempt to perpetrate a felony such as the felony of wife beating."

The jury was told that when there exists provocation which

is sufficient to reduce a homicide to manslaughter and the killing is murder, provocation may be considered by them as bearing upon the degree of the crime.

Manslaughter was said to be the unlawful killing of a human being without malice. Voluntary manslaughter was defined, as was involuntary manslaughter. The provocation which would reduce a homicide to manslaughter on the ground of sudden quarrel or heat of passion was fully dealt with. The jury was instructed that manslaughter is distinguished from murder by the absence of malice, either express or implied. Going beyond that, the court informed the jury that the killing of a human being is excusable and not unlawful when committed by accident or misfortune in the heat of passion, under sudden and sufficient provocation.

These instructions adequately advised the jury of the differences between the various degrees of murder and of manslaughter; ▮▮▮▮ ". . . it is never necessary to instruct in the exact language of a statute" (*People* v. *Hayes,* 161 Cal. App.2d 129, 134 [326 P.2d 169]) ; and there was no error in failing to give the proposed instruction on malice and murder in the first degree. (*People* v. *Cox,* 76 Cal. 281, 285 [18 P. 332] ; *People* v. *Glaze,* 139 Cal. 154, 164 [72 P. 965] ; *People* v. *Mathews, supra,* 163 Cal.App.2d 795, 801-802.)

The court instructed the jury on murder by torture as follows: "The unlawful killing of a human being which is perpetrated by torture is declared by the law to be murder of the first degree; and if you should find that the defendant committed a torture murder, you will have no choice but to designate the offense as murder in the first degree.

"The essential elements of a torture murder are:

"(1) Acts by the defendant;

"(2) Which cause the death of a human being;

"(3) Done with the intent to cause cruel pain and suffering; and

"(4) For the purpose of obtaining a confession, or for the purpose of persuasion, or for any other untoward or sadistic purpose.

"The crime of torture murder does not require any proof that the defendant intended to kill the deceased, nor does it require any proof that the deceased actually suffered pain, nor does it require any proof of malice, wilfulness, deliberation or premeditation.

"In reaching your determination as to whether or not the defendant intended to cause cruel pain and suffering for some

untoward purpose, you may take into consideration all of the circumstances surrounding the death of the deceased including acts of the defendant, if any, with respect to the deceased before the defendant knew the deceased was dead, even though said acts may have occurred after the deceased was actually unconscious or dead.''

This instruction is attacked by appellant on the following grounds: (1) It is urged that murder by torture requires proof that the deceased actually suffered pain; (2) that the instruction allowed the jury to find that appellant was guilty of murder by torture even though the appellant had no intent to kill; (3) that the instruction is erroneous in that it stated that proof of premeditation is not a necessary requisite of the offense charged.

The appellant's contention that an essential part of the crime of murder by torture is proof that pain was actually suffered by the victim is based upon somewhat ambiguous language in an opinion in *People* v. *Heslen* (Cal.) 163 P.2d 21, which was set aside by the Supreme Court through the granting of a rehearing. (See 27 Cal.2d 520 [165 P.2d 250].) The other citation in support of appellant's contention is *People* v. *Tubby, supra,* 34 Cal.2d 72, 76, in which the dictionary definition of torture is quoted.

It is quite evident that in all violent homicides there exists pain on the part of the victim, as is remarked in the case of *People* v. *Misquez, supra,* 152 Cal.App.2d 471, 480. But, clearly, it is the specific *intent* on the part of a defendant to inflict pain that is the essential element of the crime, and the trial court's instruction was correct in this respect. (*People* v. *Martinez, supra,* 38 Cal.2d 556, 561; *People* v. *Chavez,* 50 Cal.2d 778, 788 [329 P.2d 907]; *People* v. *Misquez, supra,* p. 480; *People* v. *Daugherty,* 40 Cal.2d 876, 898 [256 P.2d 911].)

The contention made by appellant that the instruction is erroneous in form by reason of the use of the following language, ''The crime of torture murder does not require any proof that the defendant intended to kill the deceased . . . nor does it require any proof of malice, wilfulness, deliberation or premeditation,'' is correct in that the sentence in question should have informed the jury that murder by torture does not require any *separate* or *additional proof* of malice, wilfulness, deliberation or premeditation. The very fact that it is a murder by torture supplies the necessary proof of these elements.

*People* v. *Valentine,* 28 Cal.2d 121, 135-136 [169 P.2d 1], holds that the intent to kill is not an essential element of murder by torture and that by statutory definition such murder is of the first degree:

"Even where the killing in perpetration or attempted perpetration of one of the named felonies is unintended and accidental, nevertheless, as held in *People* v. *Lindley* (1945) 26 Cal.2d 780, 791 [161 P.2d 227], 'the offender "is guilty of murder of the first degree by the force of the statute." [Citations.] If the evidence establishes conclusively that the murder was so committed, then only a verdict of murder of the first degree may properly be rendered. And even where the showing is not conclusive, if the record affords substantial support for the conclusion that one of the enumerated felonies was perpetrated or attempted, and the killing was committed in such perpetration or attempt, the judgment must be affirmed. [Citations.]' (See also Fricke, California Criminal Law, page 100, and cases there cited.) Similarly the murderer who kills by torture or poison may intend only to inflict suffering, not death. Evidence of the means used might support an inference that the killing was willful, deliberate, and premeditated, but where the jury has found that the killing was by poison, lying in wait, or torture it is not their function to go farther and draw inferences as to the manner of the formation and carrying out of an intention to kill. In such a case the question which the statute (Pen. Code, § 189) answers affirmatively is not, 'Is the killing willful, deliberate and premeditated?'; it is 'Is the killing murder of the first degree?' Killings by the means or on the occasions under discussion are murders of the first degree because of the substantive statutory definition of the crime." (See also *People* v. *Bernard,* 28 Cal.2d 207, 210-212 [169 P.2d 636]; *People* v. *Lindley,* 26 Cal.2d 780, 791 [161 P.2d 227]; *People* v. *Peterson,* 29 Cal.2d 69, 79 [173 P.2d 11].)

When a murder is perpetrated by torture the means used furnishes conclusive evidence of malice and premeditation. (*People* v. *Turville,* 51 Cal.2d 620, 632 [335 P.2d 678]; *People* v. *Murphy,* 1 Cal.2d 37, 41 [32 P.2d 635]; *People* v. *Pickens,* 190 Cal.App.2d 138, 145 [11 Cal.Rptr. 795]; *People* v. *Misquez, supra,* 152 Cal.App.2d 471, 480; *People* v. *Butler,* 205 Cal.App.2d 437, 440 [23 Cal.Rptr. 118].)

The instruction given by the court on the theory of murder by torture was inaccurate in the particular above mentioned, but in view of the overwhelming evidence in the case that this was in fact a murder by torture, the error is

not prejudicial. (*People* v. *Dalton*, 201 Cal.App.2d 396, 407 [20 Cal.Rptr. 51].)

▮▮▮ Appellant asserts that the court erred in failing to give various instructions requested by him.

(1) CALJIC 71-E, Accident and Misfortune.

This instruction was requested by the appellant:

"When a person commits an act or makes an omission through misfortune or by accident under circumstances that show no evil design, intention or culpable negligence, he does not thereby commit a crime, although the same act or omission committed under different circumstances and coupled with criminal intent would constitute a crime."

The record shows that the court gave CALJIC 320-A instead; it reads as follows: "The killing of a human being is excusable and not unlawful when committed by accident and misfortune in the heat of passion under sudden and sufficient provocation, when no undue advantage is taken, and when the killing is not done in a cruel or unusual manner.

"Excusable homicide is distinguished from felonious homicide in that to be excusable the killing of the human being must have been by both accident and misfortune. Even though the death was accidental and may not have been intended and was not anticipated, the homicide will not be excused if it was caused by an unlawful act, or by the doing of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection."

The instruction actually given covers the same ground as defendant's proposal and in fact seems more appropriate, as it contains a statement of the statutory law.

(2) CALJIC 72, Necessary Union of Act and Intent or Criminal Negligence.

This proposed instruction reads as follows: "In a crime such as that of which the defendant is accused by [count . . . of] the information in this case, there must exist a union or joint operation of act and intent.

"[In a crime as that of which the defendant is accused by [count . . . of] the information in this case, there must exist a union or joint operation of act and intent or criminal negligence.]"

▮▮▮ The defendant failed in his duty to fill the blanks in the form of this requested instruction and in his proposed instruction 72-B and is not entitled to claim error because of their refusal; the trial court owes no duty to a litigant to fill in the blanks in a proposed form instruction on its own motion.

On the merits, the subject matter of this instruction was in fact covered by the charge given by the court. In defining first degree murder on the theory that it was wilful, deliberate and premeditated, the court stated that "the killing must be accompanied by a clear, deliberate intent to take life," and in defining first degree murder on the theory that it was a murder by torture, the court stated that the essential elements were acts of the defendant which took the life of a human being, "done with the intent to cause cruel pain and suffering; . . ." There was no error in this regard. (*People* v. *Donnelly,* 190 Cal. 57, 59 [210 P. 523].)

(3) CALJIC 72-B, Concerning Specific Intent.

The instruction reads: "In the case of certain crimes it is necessary that in addition to the intended act which characterizes the offense, the act must be accompanied by a specific or particular intent without which such a crime may not be committed.

"Thus in the crime of_____a necessary element is the existence in the mind of the perpetrator of the specific intent to_____and unless such intent so exists that crime is not committed."

The record shows that in advising the jury as to first degree murder on the theory that the murder was wilful, deliberate and premeditated, the court informed the jury that there must be an intent to take life, and in dealing with first degree murder on the theory of torture, that the act must be done with intent to cause cruel pain and suffering. Thus it is apparent that the essential subject matter of the instruction requested by appellant was covered by those actually given.

(4) CALJIC 73, How Intent Is Manifested.

Appellant argues that the court erred in not giving the following instruction: "The intent with which an act is done is manifested by the circumstances attending the act, the manner in which it is done, the means used, and the sound mind and discretion of the person committing the act. All persons are of sound mind who are neither idiots nor lunatics nor affected with insanity.

"For the purposes of the issues now on trial you must presume that the defendant was sane at the time of his alleged conduct which, it is charged, constituted the crime described in the information."

The record shows that that portion of the instruction which informs the jury that intent may be manifested by circumstances attending the act was not given, but the part relating

to appellant's sanity was covered by the instructions given by the court. It does not appear to us that the failure to give the omitted portion of the instruction could have prejudiced the appellant in any way.

(5) CALJIC 73-B, Mental Condition Short of Insanity.

Finally, the appellant is incorrect in saying that the following instruction as given "bears little resemblance to the approved instruction":

"You are reminded that a person might be legally sane, as we define that term in dealing with the question of criminal responsibility, and yet be in an abnormal mental or nervous condition; and because of such condition he might be less likely or unable to have or to hold a specific intent or a certain state of mind, which is an essential ingredient of a certain crime. We have received evidence bearing on the mental and nervous condition of the defendant at the time of the alleged commission of the crime charged. Such evidence may be considered by you in determining whether or not defendant did any act charged against him and, if so, whether or not, at that time, there existed in him the specific mental factor and intent which must accompany that act to constitute a certain crime or degree of crime. You do not have before you any issue as to defendant's legal sanity."

The record reflects that this instruction was in fact given in the exact language requested.

The defendant next contends that the jury was not properly charged with respect to its duty in the event that it found the defendant guilty but entertained a reasonable doubt as to the degree of the offense. There are several pertinent instructions in this regard; when they are read together it is apparent that appellant's assertion is groundless:

"You may find the defendant guilty of any offense, the commission of which is necessarily included in that with which he is charged, if, in your judgment, the evidence supports such a verdict under my instructions."

"To enable you to apply the foregoing instruction, if your findings of fact require you to do so, I instruct you that the offense of Murder, of which the defendant is charged, necessarily includes the crimes of Murder in the Second Degree, Voluntary Manslaughter and Involuntary Manslaughter."

"If you find that the defendant was guilty of an offense included within the charge of the indictment, but entertain a reasonable doubt as to the crime of which he is guilty, it is your duty to convict him only of the lesser offense."

By these instructions it seems clear that the jury was told that murder of the second degree, voluntary manslaughter and involuntary manslaughter, were all lesser offenses included within the crime of murder. Thus it is apparent that under the wording of the instruction both degrees and offenses were included. (*People* v. *Dewberry*, 51 Cal.2d 548, 556-557 [334 P.2d 852].) *People* v. *Newcomer*, 118 Cal. 263, 270 [50 P. 405], is authority to the effect that even if there was error in not expanding the instruction, this cannot be magnified into reversible error.

The instruction as given informed the jury that second degree murder, voluntary and involuntary manslaughter were lesser offenses included within the crime of first degree murder here charged and further that if there was reasonable doubt as to which of two offenses the defendant should be found guilty, the jury must find the defendant guilty not of the greater but of the lesser offense. This charge, in its entirety, was a proper statement of the law.

Appellant's attack upon the instruction relative to irresistible impulse is basically a paraphrase of his earlier claim that a necessary element of murder by torture was a specific intent not only to torture the victim but to kill her. As we have already pointed out, an intent to kill is not a necessary element of murder by torture. (*People* v. *Valentine, supra*, 28 Cal.2d 121, 136.) The instruction is a proper expression of the law; it informed the jury that irresistible impulse as such is not a defense to crime but that if a person by reason of his mental condition has no control over his otherwise conscious and intentional acts, this fact may remove from his otherwise conscious and intentional acts the requisite mental element to prove malice, wilfulness, deliberation and premeditation. The court next said in effect that in the case of first degree murder by torture as the only mental element necessary to prove was the intent to inflict cruel pain and suffering for some untoward purpose, such specific intent was the only mental element which need be negated by a defendant to constitute a defense, but that in the case of a nontorture, premeditated murder the jury should consider if irresistible impulse had negated the necessary mental state implied by the words "malice" and "wilful," "deliberate," and "premeditated." The instruction is in accord with the principles of law established by *People* v. *Gorshen*, 51 Cal.2d 716, 726 [336 P.2d 492].

 The facts of this case are such that the errors in the

giving and refusing of instructions cannot be considered prejudicial; and this conclusion would also apply even if the argument of appellant that there are additional errors in the charge were upheld. For the evidence of appellant's guilt of first degree murder is so overwhelming that it is inconceivable that any jury could have reached a different verdict than first degree murder, particularly when the sole issue was so simply and sharply drawn. Appellant's counsel himself made this factor crystal clear in his argument to the jury when he asked that second degree murder and manslaughter be eliminated from consideration. He told the jury it had but one choice based upon the evidence—that they must find that the defendant was either guilty of first degree murder or innocent of all wrongdoing. He stated: ''I'm not going to tell you ... to come back here and find Spade guilty of any involuntary manslaughter, second degree murder or anything else. . . . [The district attorney is] asking for a conviction of murder in the first degree; I'm asking for acquittal.''

The test of what is prejudicial error is set forth in *People* v. *Watson*, 46 Cal.2d 818, 836 [299 P.2d 243]. The court there considered the application of article VI, section 4½, of the California Constitution, which provides that: ''No judgment shall be set aside, or new trial granted, in any case, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice'';
and held: ''Giving due consideration to the varying language heretofore employed in relating the constitutional amendment to the particular situations involved, it appears that the test generally applicable may be stated as follows: That a 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.''

Applying this test in an earlier case, *People* v. *Bernard, supra,* 28 Cal.2d 207, 214, the Supreme Court determined that errors in instructions relating to the differences between the degrees of murder did not constitute prejudicial error and would not result in a reversal where ''. . . the facts impel a

conviction of murder of the first degree both because the murder was committed in the perpetration of robbery and because it was committed by means of lying in wait, and do not admit upon any view of the evidence of a finding other than of murder of the first degree, there is no occasion whatsoever to give instructions as to the differences between the degrees of murder. Hence, although the instructions as to such differences were manifestly erroneous, the errors cannot have prejudiced the appealing defendant.''

A like statement of the law was made by the court in *People v. Dorman,* 28 Cal.2d 846, 854, 855 [172 P.2d 686]. (See also *People* v. *Lindley, supra,* 26 Cal.2d 780, 793; *People* v. *Peterson, supra,* 29 Cal.2d 69, 78-79; *People* v. *Lessard,* 58 Cal.2d 447, 452-453 [25 Cal.Rptr. 78, 375 P.2d 46].)

### ALLEGED MISCONDUCT OF THE DISTRICT ATTORNEY

The defendant claims that the district attorney committed prejudicial error in the cross-examination of the sole character witness for the defendant. He had testified that Cooley had a good reputation in the community in which he lived for peace and quiet. The district attorney then cross-examined him as to whether he had heard certain alleged matters discussed in connection with the reputation of the defendant.

The applicable rule was thus stated in *Chronicle Publishing Co.* v. *Superior Court,* 54 Cal.2d 548, 560-561 [7 Cal.Rptr. 109, 354 P.2d 637] :

'' 'In the absence of a showing of bad faith it is always within the scope of legitimate cross-examination to ask a character witness whether he has heard the person whose reputation is under investigation accused of conduct inconsistent with the character attributed to him by the witness.' (*People* v. *McKenna,* 11 Cal.2d 327, 335-336 [79 P.2d 1065].) '' (See also *People* v. *Thomas,* 58 Cal.2d 121, 132 [23 Cal.Rptr. 161, 373 P.2d 97].)

The traits or qualities here involved, peace and quiet, mean an absence of violence or quarrelsomeness. Therefore, the People had a right to interrogate the witness concerning his knowledge of appellant's reputation for an unruly and violent disposition or course of conduct. (*People* v. *Caldaralla,* 163 Cal.App.2d 32, 40 [329 P.2d 137] ; *People* v. *Burwell,* 44 Cal.2d 16, 35 [279 P.2d 744].)

Whether certain questions were objectionable because of remoteness was a matter within the sound discretion of the trial court. (*People* v. *Burwell, supra,* 44 Cal.2d 16, 35.) It does not appear that there was any abuse of that discretion.

The witness was asked if he had heard that the appellant had attempted *forcibly* to rape a young woman, had threatened to kill an individual, had attempted to throw a woman from a pier, had fought so violently with a specific man that it was necessary to call the police to stop the fight, had fought with members of his band and other individuals, had struck an individual when that person attempted to break up a fight between the appellant and his wife, had had an altercation with another person and threatened him with bodily harm, had brutally handled his wife, and had informed someone that his swollen hand was the result of beating her.

These were proper questions to put to the character witness, if asked in good faith. Appellant seeks to establish bad faith on the part of counsel for the People by pointing out he did not call character witnesses in rebuttal and citing *People* v. *Buchel,* 141 Cal.App.2d 91, 96 [296 P.2d 113]. The *Buchel* case has been distinguished in *People* v. *Johnson,* 178 Cal.App.2d 360, 366 [3 Cal.Rptr. 28], and in *People* v. *Malloy,* 199 Cal.App.2d 219, 227, 228 [18 Cal.Rptr. 545]. In *People* v. *Malloy* the court, after referring to the presumption that the prosecution acted in good faith, went on to state the general rule as follows on pages 227-228:

''Appellant, however, contends here that the bad faith of the prosecutor is shown by his failure to call character witnesses in rebuttal, and, in support of this position, relies on *People* v. *Buchel,* 141 Cal.App.2d 91, 96 [296 P.2d 113]. In *Buchel,* defendant's character witnesses testified that his reputation for chastity was good, and on cross-examination, were asked, over defendant's objection, if they had heard defendant accused of immoral conduct with his daughters. The opinion does not disclose that defendant's objections raised the issue of the prosecutor's bad faith. The court quoted the above rule set forth in *People* v. *McKenna, supra,* 11 Cal.2d 327 [79 P.2d 1065], declared that under such rule, the above question would not be improper if asked in good faith and went on to state: 'However, such questions should not be asked of a defendant's character witnesses unless the prosecution intends to call character witnesses in rebuttal to testify as to the bad reputation of defendant as to the traits involved.' (P. 96.) *Buchel* cites no authority for the foregoing statement. Nor, in our view, does the above-quoted language declare in effect that the failure of the prosecutor to call character witnesses in rebuttal is in itself prejudicial misconduct. The statement is patently dictum and considerably weakened by the fact that in *Buchel* certain testimony subsequently introduced by the

214

prosecutor 'indicates that the district attorney was no doubt acting in good faith . . .' (P. 96.)

"We find nothing in the *Buchel* case suggesting a special rule for the cross-examination of witnesses in sex perversion cases and therefore supporting defendant's contention that bad faith is shown by the failure to call witnesses in rebuttal. No foundation exists in either logic or authority for a different rule in such cases. No difference in principle exists between sex perversion cases and others. No valid basis exists for presuming the bad faith of the prosecutor in the former, but not in the latter. Indeed, we find that the general rule as announced in *People* v. *McKenna, supra,* 11 Cal.2d 327, has been applied without change where, in a prosecution for violation of section 288a of the Penal Code, defendant's character witnesses were asked if they had heard that defendant had attempted to have unnatural sex relations (*People* v. *Green,* 153 Cal.App.2d 473, 478 [314 P.2d 828]) and where, in a prosecution for violation of section 288 of the Penal Code, such witnesses were asked if they had heard defendant was cohabiting with a woman not his wife. (*People* v. *Boone, supra,* 126 Cal.App.2d 746, 751 [273 P.2d 350].)"

But respondent does not have to rely on the presumption that the action of the district attorney was taken in good faith, for the record establishes that fact. At the beginning of the cross-examination defense counsel suggested that the district attorney might be "concocting" these facts and that they were not true. At that time the district attorney offered to exhibit court records for inspection. The court informed defense counsel that if he desired proof the district attorney would have to supply it, to which the district attorney replied, "I certainly will." At that point the defendant's attorney stated his only challenge was "the matter of peace and quiet," and dropped the demand for proof. The record further shows that during subsequent discussion in chambers, it was made clear that the district attorney had evidence to support the questions asked by him; the questions asked in cross-examination were not predicated upon mere fantasy or imagination but could be supported by documentary proof. Therefore, there was no misconduct.

Appellant also contends that the district attorney was guilty of misconduct in failing to call certain witnesses and to prove certain alleged facts as stated in his opening statement; specifically, appellant refers to the prosecuting officer's statement that he would produce specified evidence through

Dorothy Cooley, a daughter-in-law of the defendant, and Bobbie Bennett, his business agent. Dorothy Cooley and Bobbie Bennett were not called as witnesses by either side, and no evidence was introduced to prove what the district attorney had claimed would be shown by the testimony of Dorothy Cooley; a portion of the promised evidence relating to Bobbie Bennett was in fact given by other witnesses, but some of the facts that the district attorney said he would prove by Bobbie Bennett were not proven at all.

It should be noted that the defendant did not object to any portion of the opening statement of the district attorney and that therefore he is not in a favorable position to raise this point on appeal. (*People* v. *Granados,* 49 Cal.2d 490, 495 [319 P.2d 346]; *People* v. *Chester,* 142 Cal.App.2d 567, 574 [298 P.2d 695].)

A quotation from the case of *People* v. *Ramsey,* 172 Cal.App.2d 266, 272-273 [342 P.2d 287], is in point:

"First, we examine the opening statement. In such a statement 'it is the duty of counsel to refrain from referring to facts which he cannot or will not be permitted to prove.' (*People* v. *Chester* (1956) 142 Cal.App.2d 567, 574 [298 P.2d 695].) But the failure to produce proffered proof, 'either on account of the rules of evidence or for any other reason, does not necessarily indicate prejudice.' (*People* v. *Planagan* (1944) 65 Cal.App.2d 371, 407 [150 P.2d 927].) The statement, of course, does not constitute and cannot 'be considered as evidence' and 'binds no one by its recitals.' (*People* v. *Stoll* (1904) 143 Cal. 689, 693, 694 [77 P. 818].) Because of the limitations upon the effect of the opening statement, one who asserts it as misconduct must prove more than the mere failure to adduce the testimony described in it. In *People* v. *Wong Hing* (1917) 176 Cal. 699 [169 P. 357], defendant assigned misconduct on the part of the district attorney in a prosecution for murder because in his opening statement he said, ' "We expect to show that on . . . [March 5, 1917] . . . a Chinese tong was begun in this city," ' and 'no evidence was offered in support of the statement . . . to the jury. . . .' The court held, 'there is nothing in the record tending to show that it [the statement] was made in bad faith or without intention of trying to support it by evidence. In the absence of such showing it cannot be said the district attorney was guilty of misconduct because he failed to produce such evidence.' (P. 703.) To the same effect, *People* v. *Berryman* (1936) 6 Cal.2d 331 [57 P.2d 136].

"In the instant case, we lack a showing of deliberative intent of the prosecutor not to produce and examine Childress. Admittedly the task of finding and subpenaing Childress might have been difficult; it had actually failed in the first trial. But the possibility of failure to produce a wanted witness and its later culmination into fact does not turn the prosecutor's stated purpose into a strategy of bad faith. The opening statement of the expected proof and its subsequent collapse cannot *per se* show an unfair intent; if it did, any bare failure of proof promised in an opening statement could be converted into grounds for reversal."

In order to prevail on this point, appellant would have to show that the district attorney's statements were made in bad faith or without the intention of trying to support them by evidence. (*People* v. *Carr,* 163 Cal.App.2d 568, 575 [329 P.2d 746]; *People* v. *Andrus,* 159 Cal.App.2d 673, 680 [324 P.2d 617].)

Appellant asserts that the district attorney's bad faith is shown by the fact that he attempted to establish the facts on cross-examination of the appellant which he had said he would prove by other witnesses and, secondly, by the statement in his argument to the jury that he had in fact proven some of these matters. Of course, when a defendant takes the stand and makes a general denial of the crime with which he is charged, the permissible scope of cross-examination is very broad. (*People* v. *Watson, supra,* 46 Cal.2d 818, 832; *People* v. *Zerillo,* 36 Cal.2d 222, 228 [223 P.2d 223]; *People* v. *Phillips,* 197 Cal.App.2d 159, 162, 163 [17 Cal.Rptr. 301]; *People* v. *Taylor,* 189 Cal.App.2d 348, 354 [11 Cal.Rptr. 150]; *People* v. *Polak,* 165 Cal.App.2d 226, 233, 234 [331 P.2d 662].)

On his direct examination the appellant had covered in detail the events that he claimed had transpired on the day of the murder. He admitted that he struck the victim while in the living room and again when they went to the bedroom, and he also testified to his version of what happened when his daughter, Melody, was present and after she left. He claimed that he had no memory of any event after Melody left until the arrival of Bobbie Bennett and that he did not see Dorothy Cooley that night. The district attorney had a right to interrogate the appellant regarding the arrival of Bobbie Bennett and his conversation with her and whether or not Dorothy Cooley had been at appellant's house on the night of the killing. This cross-examination involved appellant's ability to recall events on the night of the crime and thus reflected upon his accuracy and veracity. In his

closing argument the district attorney asserted that he had in fact proven all that he had said would be shown by the testimony of Bobbie Bennett. This statement was only partly true, as he did not prove by other witnesses all that he had said he would show by her testimony. No objection was made to any of these matters, and appellant accordingly waived any right to claim they constituted misconduct. (*People* v. *Lyons,* 50 Cal.2d 245, 262 [324 P.2d 556].)

Appellant urges that the district attorney's attempt in his opening and closing arguments to explain why Dorothy Cooley and Bobbie Bennett had not been called as witnesses was prejudicial. There was no objection made to the matters contained in the People's opening argument, and as we believe that any prejudicial effect would have been effaced by a timely admonition of the court, the appellant at this time cannot successfully assert that prejudice resulted. (*People* v. *Robillard, supra,* 55 Cal.2d 88; *People* v. *Turville, supra,* 51 Cal.2d 620, 636; *People* v. *Hampton,* 47 Cal.2d 239, 240, 241 [302 P.2d 300]; *People* v. *Byrd,* 42 Cal.2d 200, 208 [266 P.2d 505].)

 Subsequently, in his closing argument, the district attorney made an attempted explanation of his failure to call the missing witnesses. These statements were rightfully made in answer to defendant's argument. Appellant's counsel saw fit to devote a substantial portion of his lengthy plea to the jury to a review of all the facts the district attorney said he would prove in his opening statement but had in fact failed to establish; he strenuously argued that it was incumbent upon the district attorney to have put Dorothy Cooley on the stand, and he accused the district attorney of deliberately deceiving the jury. Under such circumstances the district attorney had a right to answer the charge made against him by defense counsel. (*People* v. *Butcher,* 174 Cal.App.2d 722, 730 [345 P.2d 127]; *People* v. *Kefry,* 166 Cal.App.2d 179, 192, 193 [332 P.2d 848].) As stated in *People* v. *Wolfe,* 42 Cal.2d 663, 669 [268 P.2d 475], the remarks of the district attorney, in the light of the entire record in this case, cannot be said to be prejudicial or to have resulted in a miscarriage of justice.

The judgment is affirmed.

Brown, J., and Stone, J., concurred.

A petition for a rehearing was denied January 17, 1963, and appellant's petition for a hearing by the Supreme Court was denied February 13, 1963.